******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE CARLA C.*
(AC 38541)

Beach, Sheldon and Mullins, Js.

*Argued April 7—officially released July 22, 2016***

(Appeal from Superior Court, judicial district of Middlesex, Child Protection Session at Middletown, C. Taylor, J.)

*Benjamin M. Wattenmaker*, assigned counsel, for the appellant (respondent father).

*Joshua Michtom*, assistant public defender, for the appellee (petitioner).

*Brya A. Darley*, for the minor child.

*Opinion*

MULLINS, J. In this appeal from the termination of the parental rights of the respondent father, Carlos C., the dispositive issues are (1) whether a parent's involvement in a crime before the birth of his child may be an act of parental commission or omission forming the basis for termination of his parental rights pursuant to General Statutes § 45a-717 (g) (2) (B),[1] and (2) whether a court may find that no ongoing parent-child relationship exists, pursuant to § 45a-717 (g) (2) (C),[2] when a custodial parent's conduct has contributed significantly to the establishment of that ground for termination. We agree with the respondent that his commission of a crime before the birth of the child in this case, Carla C. (Carla), is not a parental act of commission or omission, as that basis for termination properly is understood. We also agree with the respondent that when a custodial parent has interfered with an incarcerated parent's visitation and other efforts to maintain an ongoing parent-child relationship with the parties' child, the custodial parent cannot terminate the noncustodial parent's parental rights on the ground of no ongoing parent-child relationship. Accordingly, we reverse the judgment of the trial court granting the petition of the petitioner mother, Glenda G., for termination of the respondent's parental rights as to Carla.

The following facts and procedural history, as found by the trial court or as undisputed in the record, inform our resolution of the respondent's appeal. The parties began a relationship in September, 2008, shortly after which the petitioner became pregnant. On January 9, 2009, while the petitioner was pregnant, the respondent was involved in a drive-by shooting in Torrington. Carla was born six months later on July 13, 2009. On July 29, 2009, the respondent executed an acknowledgment of paternity as to Carla.

On August 4, 2009, the respondent was arrested and charged in connection with the drive-by shooting.[3] On June 3, 2011, the respondent pleaded guilty to one count of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48 (a), and one count of assault in the first degree as an accessory in violation of § 53a-59 (a) (1). The respondent subsequently was sentenced to a total effective term of twenty years incarceration, execution suspended after nine years, with five years probation.[4] The respondent's maximum release date is May 7, 2018.

On seven occasions between August 26, 2009, and August 19, 2011, the petitioner took Carla to visit the respondent in prison. She then decided that she no longer wanted to be in a relationship or raise a child with the respondent. Accordingly, she unilaterally decided that visits with the respondent were no longer in Carla's best interest. The respondent has not seen

Carla since August 19, 2011.

In the meantime, the petitioner met and began a relationship with Steve M. (Steve), whom she described as a "real man" and "[the] father figure that [Carla] deserves." The petitioner and Carla moved into Steve's home in the summer of 2011 and remained there until May, 2014, when the relationship ended for a time and the petitioner and Carla moved into their own apartment.[5] The petitioner and Steve resumed their relationship in early 2015. Since then, Steve and the petitioner, together with Carla, frequently stay at each other's home. Carla refers to Steve by name and as "Dad" or "Daddy Steve." Steve, who shares with the petitioner the cost of Carla's dance lessons and day care, intends to adopt Carla if the respondent's parental rights are terminated.

Since his last visit with Carla in 2011, the respondent has sent her cards and letters. The petitioner threw away all of the cards and letters without showing them to Carla, including letters and drawings that the respondent had asked Carla's attorney to give to the petitioner to give to Carla. The respondent last spoke to Carla by telephone on her birthday in 2014, when she was at the Florida home of the petitioner's mother. He acknowledged that during that call, Carla did not recognize him as her father.

In early 2012, after she had decided she no longer wanted the respondent in Carla's life, the petitioner obtained an order from the MacDougall-Walker Correctional Institution (MacDougall-Walker), where the respondent was incarcerated, directing the respondent to cease all oral and written communication with the petitioner and Carla, either directly or through a third party. The order notified the respondent that his failure to comply with it would result in disciplinary action.

The petitioner subsequently initiated a separate custody action in the judicial district of Litchfield, pursuant to which, on June 26, 2012, the parties entered into a stipulation awarding the petitioner sole legal and physical custody of Carla, and permitting the respondent one visit with Carla every sixty days. The stipulation provided that the respondent's mother would transport Carla to and from MacDougall-Walker. The stipulation also provided that the respondent's parenting access was to be reevaluated upon his release from prison. Although the petitioner believed that visits between the respondent and Carla in prison were not in Carla's best interest, she did not seek to modify the visitation order.

Despite the parties' stipulation, none of the bimonthly visits provided for in the stipulation took place. As a result, the respondent filed a number of motions for contempt in which he sought to enforce the visitation provided for in the stipulation.[6] Pursuant to these motions, the court issued orders on April 18, and Octo-

ber 8, 2013, that the respondent be given visits.[7] The court ordered that the visits were to occur on May 19 and November 24, 2013. Neither of the visits took place.[8]

While incarcerated, the respondent, whose employment history consists of two weeks of work at a Wendy's restaurant in Florida, has obtained a general equivalency diploma and a diploma in business management. He also has completed course work in real estate appraisal. The respondent's mother, who has supported the respondent financially throughout his life, has paid for his education in prison. At the time of the trial on the petition for termination of parental rights, the respondent expected to enroll in anger management and parenting programs provided by the Department of Correction.

On December 18, 2013, the petitioner filed a petition for termination of the respondent's parental rights in Torrington Probate Court. In the petition, the petitioner alleged two statutory grounds for termination: (1) that Carla had been denied the care, guidance, or control necessary for her physical, educational, moral, or emotional well-being, by reason of the respondent's act of commission or omission; see footnote 1 of this opinion; and (2) that there was no ongoing relationship between the respondent and Carla, and to allow further time for the establishment of the relationship would be detrimental to Carla's best interest. See footnote 2 of this opinion. The petitioner submitted an accompanying affidavit in which she averred the following: that the respondent was incarcerated following a conviction for assault and risk of injury to a child; that the respondent had participated in a drive-by shooting of a house in which a child was present; that the respondent will be incarcerated until 2018; that the respondent had seen Carla only a handful of times; and that visiting the respondent in prison was not in Carla's best interest.[9]

By motion dated December 20, 2013, the petitioner sought to suspend the respondent's visitation with Carla. In the motion to suspend visitation, the petitioner represented that although the respondent's mother had attempted to facilitate visitation, the arrangement was unworkable, and that, in any event, visiting the respondent in prison was not in Carla's best interest. By notice dated February 21, 2014, the court granted the petitioner's motion to suspend visitation, pending the outcome of the Probate Court proceedings on the petition to terminate the respondent's parental rights.

By motion dated February 21, 2014, the respondent successfully sought transfer of the action to the Superior Court for Juvenile Matters. The Superior Court for Juvenile Matters subsequently transferred the action to the Child Protection Session at Middletown. On September 12, 2014, the respondent moved for an order of visitation with Carla pending the resolution of the petition for termination of parental rights. The court, *Ginoc-*

*chio*, *J.*, consolidated for trial the respondent's motion for visitation and the petition for termination of parental rights.

The court, *C. Taylor*, *J.*, held a trial on the consolidated petition for termination of parental rights and motion for visitation on June 5 and 9, 2015, with closing arguments on June 23, 2015. By memorandum of decision dated October 13, 2015, the court concluded that the petitioner had proven both alleged grounds for termination and that termination was in Carla's best interest.[10] The court made no ruling on the respondent's motion for visitation. Accordingly, the court granted the petition for termination of parental rights. This appeal followed. Additional facts will follow as necessary.

The respondent presents three principal claims on appeal, one pertaining to the first ground for termination and two pertaining to the second. With regard to the first ground, the respondent claims that the court erred as a matter of law in determining that the respondent deprived Carla of the care necessary to her well-being. With regard to the second ground, the respondent claims that (1) as a matter of law,[11] a parent may not prevent the other parent from maintaining a relationship with their child and then successfully petition to terminate parental rights on the ground that there is no ongoing parent-child relationship, and (2) the respondent's incarceration, standing alone, is an insufficient basis on which to terminate his parental rights.

"A hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more grounds for termination of parental rights set forth in . . . General Statutes . . . [§] 45a-717 (g) (2)[12] has been proven by clear and convincing evidence.[13] . . .

"In the dispositional phase . . . the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [her] environment. . . . [T]he trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child."[14] (Citations omitted; footnotes added; internal quotation marks omitted.) *In re Payton V.*, 158 Conn. App. 154, 160, 118 A.3d 166, cert. denied, 317 Conn. 924, 118 A.3d 549 (2015).

"Clear and convincing proof is a demanding standard denot[ing] a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in

the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *In re Justice V.*, 111 Conn. App. 500, 513, 959 A.2d 1063 (2008), cert. denied, 290 Conn. 911, 964 A.2d 545 (2009).

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [the challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . .

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Payton V.*, supra, 158 Conn. App. 161.

I

ACT OF PARENTAL COMMISSION OR OMISSION

The respondent first claims that the trial court erred as a matter of law in finding that the petitioner proved that he had deprived Carla of the care necessary to her well-being because there was no evidence that any specific act of parental commission or omission caused Carla to suffer serious physical or emotional injury. Specifically, he argues that the trial court could not properly conclude that this ground for termination had been established because it did not find either (1) that Carla had suffered a serious physical or emotional injury or (2) that he had committed an act of parental commission or omission. To the extent that the court did find that he had committed an act of parental commission or omission, he argues, the court improperly based its finding on conduct that occurred before Carla was born—namely, his participation in the drive-by shooting for which he currently is incarcerated.

The petitioner counters that the denial of care, guidance, and control that must be proven to establish this ground for termination does not require a finding of serious physical or emotional injury. She also argues that the court properly found that the respondent had engaged in an act of commission or omission. She characterizes this act as "the respondent's voluntary absence from his daughter's life . . . which continued for at least six years after Carla's birth."

Under our well established law, to provide a basis for termination of parental rights on the ground set

forth in § 45a-717 (g) (2) (B); see footnote 1 of this opinion; an act of parental commission or omission must occur after the birth of the child. "[P]arental conduct justifying termination of parental rights pursuant to § [45a-717 (g) (2) (B)] must occur after birth and . . . the statute does not contemplate termination of parental rights upon the basis of prenatal conduct." *In re Valerie D.*, 223 Conn. 492, 513, 613 A.2d 748 (1993); id., 525 (mother's injection of cocaine hours before child's birth could not justify termination of mother's parental rights on ground of act of parental commission or omission).

In the present case, on the basis of our review of the court's memorandum of decision, we conclude that the court improperly based its conclusion that the respondent had engaged in an act of parental commission or omission on its finding that the respondent was involved in the 2009 drive-by shooting while the petitioner was pregnant with Carla. The trial court characterized the petitioner's alleged ground for termination as follows: "[The petitioner] . . . claims that [the respondent's] act or acts of parental commission or omission revolve around his involvement in the criminal activities that culminated in his participation in the Torrington drive-by shooting in [January],[15] 2009, and his substantial jail sentence resulting from his criminal activities." The court concluded that "the petitioner has proven, by clear and convincing evidence, that [the respondent] has denied Carla . . . the care, guidance or control necessary for Carla's physical, educational, moral or emotional well-being as a result of his criminal activities, which resulted in his incarceration."

In reaching this conclusion, the court made the following findings. "The clear and convincing evidence shows that [the respondent], no tyro to the criminal justice system, knew . . . in [January], 2009, that [the petitioner] was pregnant with his child. He further knew that further involvement with the criminal justice system would have dire consequences for his probation. He also knew that involvement in a drive-by shooting had the potential to result in a substantial period of incarceration, as it actually did. [The respondent] had to know the potential for the enforced separation from his child throughout her childhood that would result if he were incarcerated. This potentiality did, [in] fact, come to fruition as a result of [the respondent's] felony convictions in 2011. The clear and convincing evidence also shows that [the respondent] will be incarcerated for an additional, substantial period of time and will be on probation following his discharge from [the Department of Correction]."

The court identified the "act or acts of parental commission or omission" forming the basis of the ground for termination of parental rights identified in § 45a-717 (g) (2) (B) as the respondent's "criminal activities

which resulted in his incarceration"—specifically, his involvement in the drive-by shooting in January, 2009, of which he was convicted and currently is incarcerated. In January, 2009, however, Carla had not yet been born. The court's conclusion that the respondent's conduct prior to Carla's birth constituted an "act or acts of parental commission or omission" contemplated by § 45a-717 (g) (2) (B) contravenes the clearly established rule that a parent's prenatal conduct may not be the basis for termination of parental rights on this ground. *In re Valerie D.*, supra, 223 Conn. 513. Accordingly, the court's conclusion that the petitioner proved this ground for termination cannot stand. Because the respondent's participation in a drive-by shooting prior to Carla's birth may not constitute the requisite act of commission or omission, we need not determine whether the court found that Carla suffered a serious physical or emotional injury.

## II

### NO ONGOING PARENT-CHILD RELATIONSHIP

The respondent next claims that the court's conclusion that he had no ongoing parent-child relationship with Carla was legally incorrect under the circumstances of this case. The respondent's argument in support of this claim is twofold: first, as a matter of law, this ground for termination may not be established where a custodial parent unreasonably has interfered with the development of the other parent's relationship with the parties' child; second, in the alternative, the court improperly terminated the respondent's parental rights on the basis of his incarceration alone. We agree with the respondent that a parent whose conduct inevitably has led to the lack of an ongoing parent-child relationship may not terminate parental rights on this ground.[16]

The following additional procedural history is relevant to this claim. In concluding that the petitioner had established this ground for termination, the court in its memorandum of decision determined that "no parental relationship ever existed between this respondent and Carla" because the respondent had never provided Carla with the necessities to meet her daily needs, and Carla had not formed any positive memories of the respondent. Although the court found that "[c]learly, the [petitioner] was not in favor of Carla visiting [the respondent] [in prison] and did not go out of her way to facilitate visitation," it concluded that "the proximate cause of the lack of an ongoing parent-child relationship was the fault of [the respondent] himself. [The respondent was] a gang member . . . who decided to involve himself in a drive-by shooting despite . . . the possibility that he would be unable to appropriately parent his child due to incarceration."

Despite finding that the petitioner had refused to facilitate visits between the respondent and Carla, the

court found that there nevertheless was no evidence that more visits would have led to the development of an ongoing parent-child relationship: "This matter does not hinge upon the visits in [prison]. There was evidence in the trial that [the respondent] was going to receive only one visit in [prison] with Carla every sixty days. The lack of an ongoing relationship solely relates to Carlos' incarceration—a matter about which he had total and absolute control."[17]

### A

The following foundational principles governing the judicial severance of the parent-child relationship undergird our resolution of this claim. "[T]he termination of parental rights is defined . . . as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . . It is, accordingly, a most serious and sensitive judicial action. . . . Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); see also *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 295, 455 A.2d 1313 (1983) (noting that it is both a fundamental right and the policy of this state to maintain the integrity of the family). Termination of parental rights *does not follow automatically from parental conduct justifying the removal of custody*. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. *Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

"Accordingly, [our legislature has] carefully limited situations in which countervailing interests are sufficiently powerful to justify the irretrievable destruction of family ties that the nonconsensual termination of parental rights accomplishes. . . .

"As a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination. . . . [I]nsistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not [however] inconsistent with concern for the best interests of the child. . . . A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship. . . .

"Similarly, questions concerning the ultimate custodial placement of the child may not be intermingled with the issues of termination. . . . [A] parent cannot be displaced because someone else could do a better job of raising the child . . . ." (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *In re Jessica M.*, 217 Conn. 459, 464–67, 586 A.2d 597 (1991).

B

Ascertaining whether no ongoing parent-child relationship exists pursuant to § 45a-717 (g) (2) (C); see footnote 2 of this opinion; "requires the trial court to make a two-pronged determination. First, there must be a determination that no parent-child relationship exists, and, second, the court must look into the future and determine whether it would be detrimental to the child's best interests to allow time for such a relationship to develop. . . . The best interest standard . . . does not become relevant until after it has been determined that no parent-child relationship exists." (Citation omitted; internal quotation marks omitted.) *In re Michael M.*, 29 Conn. App. 112, 128, 614 A.2d 832 (1992).

The definition of "no ongoing parent-child relationship" has evolved in light of a "sparse" legislative history.[18] *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 669, 420 A.2d 875 (1979) (examining history of similar language in predecessor to § 17a-112 [j] [3] [D]). "[T]he language of [this ground for termination] contemplate[s] a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." (Internal quotation marks omitted.) *In re Kezia M.*, 33 Conn. App. 12, 21, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).

Because "[t]he statute's definition of an ongoing parent-child relationship . . . is inherently ambiguous when applied to noncustodial parents who must maintain their relationships with their children through visitation"; (internal quotation marks omitted) *In re Jessica M.*, supra, 217 Conn. 467–68; "[t]he evidence regarding the nature of the respondent's relationship with [the] child at the time of the termination hearing must be reviewed in the light of the circumstances under which visitation had been permitted." Id., 473; see also *In re Alexander C.*, 67 Conn. App. 417, 425, 787 A.2d 608 (2001) ("the evidence regarding the quality of [a parent's] relationship with [a] child must be reviewed in the light of the [parent's] limited access to visitation at the time of the petition" [internal quotation marks omitted]), aff'd, 262 Conn. 308, 813 A.2d 87 (2003).

In determining whether such a relationship exists, generally, "the ultimate question is whether the child

has no present [positive] memories or feelings for the natural parent." (Internal quotation marks omitted.) *In re Jessica M.*, supra, 217 Conn. 467–68; see id., 470 ("the standard contemplates a relationship that has some positive attributes"). "[I]n cases involving the development of a parent-child relationship in the earliest stages of the child's life, [however] we also must be mindful of the positive feelings of the parent toward the child." *In re Alexander C.*, supra, 67 Conn. App. 425; see *In re Valerie D.*, supra, 223 Conn. 532 ("where the child involved is virtually a newborn infant whose present feelings can hardly be discerned with any reasonable degree of confidence . . . the inquiry must focus, not on the feelings of the infant, but on the positive feelings of the natural parent").

In *In re Jessica M.*, supra, 217 Conn. 472–73, 475, our Supreme Court emphasized the importance of considering limitations placed on a noncustodial parent's access to her child, holding that where the petitioners, the child's legal guardians, had limited the respondent mother's visitation with the child, the petitioners failed to prove the lack of an ongoing parent-child relationship even though the respondent had not cared for the child on a day-to-day basis.[19] In that case, the respondent, acknowledging that her drug addiction prevented her from parenting, had voluntarily consented to the child's paternal aunt and uncle assuming guardianship. Id., 462–63. The guardians, who wished to adopt the child, then successfully petitioned for termination of parental rights, and the respondent appealed. Id., 464. Our Supreme Court reversed the trial court's finding that there was no ongoing parent-child relationship "essentially because the respondent had not provided day-to-day care for her daughter for more than a year"; id., 463; and therefore was not the child's " 'psychological parent' . . . ." Id., 464.

Our Supreme Court rejected the standard applied by the trial court as "plac[ing] noncustodial parents, including parents who are granted only limited visitation rights . . . at risk of losing their remaining parental rights simply through the passage of time regardless of fault." Id., 467. Because of the statute's inherent ambiguity as applied to the noncustodial respondent, the court concluded that the ground for termination could not be established so long as the child maintained some positive feelings for the respondent. Id., 467–70.

Turning to the evidence regarding the nature of the respondent's relationship with her child at the time of the termination hearing, the court stated that it "must be reviewed in the light of the circumstances under which visitation had been permitted." Id., 473. Notably in this regard, ever since assuming guardianship, the petitioners had restricted the respondent's access to the child to a few hours of supervised visitation every other week and weekly phone calls. Id., 472–73.

Although the respondent consented to this schedule when she still was actively abusing drugs, she sought increased and unsupervised visitation after achieving some months of sobriety; the petitioners, however, refused. Id., 473. In light of these limitations and the trial court's factual finding that the child maintained some affection for the respondent, our Supreme Court concluded that the petitioners had not proven the lack of an ongoing parent-child relationship by clear and convincing evidence. Id., 475.[20]

One year later, in *In re Valerie D.*, our Supreme Court considered the effect of limitations placed on a noncustodial parent's access to the child where the child was too young to have developed any discernible feelings for the parent. The court in *In re Valerie D.*, supra, 223 Conn. 532, concluded that the Commissioner of Children and Families (commissioner)[21] may not terminate parental rights on the ground of no ongoing parent-child relationship where, by virtue of the commissioner's coterminous petitions for custody and termination of parental rights, which had been filed immediately after the child's birth, the child had been in foster care virtually from birth until the adjudication of a lack of an ongoing parent-child relationship three and one-half months later. In that case, the child was placed in foster care because the respondent mother had ingested cocaine just prior to the child's birth. Id., 500, 528. The respondent subsequently attempted to visit the child at her foster home, but various circumstances, including the respondent's difficulty finding transportation, inability to procure a required certification that she was free from communicable diseases, and enrollment in a drug treatment program, permitted only sporadic visitation. See id., 528 and n.28.

On appeal from the termination of the respondent's parental rights, our Supreme Court determined that "the lack of an ongoing parent-child relationship between the respondent and the child was the direct result of the fact that the child was in foster care apart from the respondent for almost the entire period of time between the birth and the adjudication date." Id., 531. "[O]nce the child had been placed in foster care . . . a finding of a lack of an ongoing parent-child relationship three and one-half months later was inevitable . . . because absent extraordinary and heroic efforts by the respondent, the petitioner was destined to have established the absence of such a relationship." Id., 533. The court concluded that the statutes governing commitment and termination of parental rights could not be read "to enable the petitioner to gain and maintain custody of a newborn infant . . . under circumstances, as in this case, that will lead almost inevitably to the ground for termination [of no ongoing parent-child relationship]." Id.

In arriving at this conclusion, the court in *In re Valerie*

*D.* noted that "[u]ntil now . . . we have not been required to apply [the] definition [of no ongoing parent-child relationship] to a case, like this, where the child involved is virtually a newborn infant whose present feelings can hardly be discerned with any reasonable degree of confidence." Id., 532. The court determined that "in such a case, the inquiry must focus, not on the feelings of the infant, but on the positive feelings of the natural parent." Id.

Subsequently, this court rejected an incarcerated parent's argument that the inquiry into whether he had maintained an ongoing relationship with his child properly should have focused on his positive feelings for the child, who did not recognize him as a parent. *In re Alexander C.*, supra, 67 Conn. App. 421. The respondent in *In re Alexander C.* argued that *In re Valerie D.* should control the inquiry because, as in that case, the child's young age made his feelings difficult to discern. Id., 422–23.

In concluding that the commissioner had established the lack of an ongoing parent-child relationship, this court distinguished *In re Valerie D.* on the ground that in that case, "the absence of a parent-child relationship was not for lack of effort on the mother's part." Id., 424. In *In re Alexander C.*, by contrast, "the respondent, rather than the commissioner, created the circumstances that caused *and perpetuated* the lack of an ongoing relationship between the respondent and [the child]." (Emphasis added.) Id. Specifically, "[d]uring his incarceration, the respondent made no attempts to develop a relationship with [the child]. We are not persuaded that he could not develop such a relationship simply because [a] protective order prohibited him from doing so.[22] . . . [T]he respondent made no attempt to modify the court's protective order to one of supervised visitation, an action that occurs with a fair amount of frequency in family cases in which criminal charges are pending. In our view, to expect such an affirmative step on the part of the respondent does not require him to make extraordinary and heroic efforts. . . . Certainly, the absence of the respondent from [the child's] life prevents him from taking even the most minimal steps of parenting. His absence may have prevented him from providing a home and other life necessities, but it did not prevent him from expressing interest in the health, care and well-being of the child during that absence." (Citation omitted; footnote added; internal quotation marks omitted.) Id., 425; see also *In re Lukas K.*, 120 Conn. App. 465, 468, 992 A.2d 1142 (2010) (affirming granting of mother's petition for termination of incarcerated father's parental rights where respondent admitted that he had never seen or had contact with child), aff'd, 300 Conn. 463, 14 A.3d 990 (2011). Accordingly, although careful to review the evidence "in the light of the [parent's] limited access to visitation at the time of the petition" (internal quotation marks omitted);

*In re Alexander C.*, supra, 67 Conn. App. 425; this court affirmed the trial court's conclusion that no ongoing parent-child relationship existed despite the respondent's professed positive feelings toward the child. Id., 426–27.

From these cases, we glean two relevant variables on which the inquiry into whether an ongoing parent-child relationship exists may turn: (1) a child's very young age, in light of which the parent's positive feelings toward the child are significant; and (2) another party's interference with the development of the relationship, in light of which the parent's efforts to maintain a relationship, even if unsuccessful, may demonstrate positive feelings toward the child.[23] We recognize that the child's positive feelings for the noncustodial parent generally are determinative; *In re Jessica M.*, supra, 217 Conn. 467–68, 470; except where the child is too young to have any discernible feelings, in which case the positive feelings of the parent for the child play a role in the determination. *In re Valerie D.*, supra, 223 Conn. 532; *In re Alexander C.*, supra, 67 Conn. App. 425. Even where the parent professes such feelings, however, the parent's perpetuation of the lack of a relationship by failing to use available resources to seek visitation or otherwise maintain contact with the child may establish the lack of an ongoing parent-child relationship. *In re Alexander C.*, supra, 426–27. Finally, evidence of the existence of a parent-child relationship is to be viewed in the light of circumstances that limited visitation; id., 425; including the conduct of the child's custodian at the time of the petition. *In re Jessica M.*, supra, 473; see also *In re Valerie D.*, supra, 533.

In the present case, therefore, we begin with the circumstances that limited the respondent's access to Carla, namely, their initial separation occasioned by his incarceration and the petitioner's subsequent refusal to facilitate visits or permit other contact. With regard to the latter, it was undisputed at trial that after fewer than ten visits, the petitioner stopped bringing Carla to visit the respondent as of August, 2011. She then obtained an order from the correctional facility that barred the respondent from initiating any contact with her or Carla, on pain of disciplinary action. Subsequently, she sought and obtained sole custody of Carla, stipulating that the respondent would have bimonthly visits with Carla at the prison. She nevertheless neither facilitated those visits nor moved to modify visitation.[24] Additionally, the petitioner has not told Carla that the respondent is her father or shown her pictures of the respondent; indeed, she has discarded the defendant's cards and letters to Carla. Short of "extraordinary and heroic efforts" by the respondent; *In re Valerie D.*, supra, 223 Conn. 533; the petitioner was able completely to deny him access to Carla.

As the court found, Carla, as a result, "has not formed

any positive parental memories of [the respondent]." She was, however, only two years old when the petitioner began denying the respondent visitation and otherwise severed contact. In light of the petitioner's denial of visitation beginning when Carla was still in the earliest stages of life, "we also must be mindful of the positive feelings of the [respondent] toward the child." *In re Alexander C.*, supra, 67 Conn. App. 425; see also *In re Valerie D.*, supra, 223 Conn. 532.

In this regard, there is undisputed evidence that the respondent expressed interest in Carla's health and well-being during his absence. Cf. *In re Alexander C.*, supra, 67 Conn. App. 426–27. Since the petitioner ceased visitation, the respondent has sent cards and letters to Carla both through the mail and via Carla's attorney. With the consent of the petitioner's mother, he contacted Carla by phone when she visited her grandmother in Florida. Although his work history prior to his present incarceration was nearly nonexistent, to improve his job prospects upon release he has earned a general equivalency diploma and a diploma in business management and completed coursework in real estate appraising. He awaited the opportunity to enroll in fatherhood and anger management classes provided by the Department of Correction. He filed numerous contempt motions in an attempt to enforce the stipulated bimonthly visits and obtained orders for visits on specific dates.[25]

Although our appellate courts are not bound to follow the decisions of the trial court, we find instructive the well reasoned decision of the Superior Court in the factually similar case of *In re Caleb P.*, 53 Conn. Supp. 329, 346, 113 A.3d 507 (2014), in which the court determined that a custodial parent could not establish the lack of an ongoing parent-child relationship between the incarcerated respondent and the parties' children where the custodial parent had refused to allow the respondent visits in prison with the children. In that case, the respondent father had been incarcerated intermittently throughout the children's lives, missing the birth of their younger child, with whom he concededly had no relationship. Id., 340, 346. The petitioner mother "chose not to" facilitate the court-ordered visits that the respondent had sought because she did not think prison was a healthy environment for the children. Id., 343. On at least one occasion, the respondent filed a self-represented motion for contempt seeking to enforce the visitation order. Id.

Before determining whether the petitioner proved that there was no ongoing parent-child relationship, the court stated that the allegations in the petition "must be viewed within the context of the great animosity the custodial parent, mother, harbors for the noncustodial father. It is clear that it is not permissible to terminate the parental rights of an individual when it is the [peti-

tioner who] is largely or solely responsible for the existence of the grounds upon which termination is based." (Internal quotation marks omitted.) Id., 337.

Because, among other reasons, the petitioner had interfered with the respondent's efforts to maintain a relationship with the children, the court concluded that the petitioner had failed to prove that there was no ongoing parent-child relationship: "In *In re Valerie D.* . . . the court concluded [that] the state may not, under the circumstances of this case, obtain and maintain custody of the child so as to create a lack of an ongoing parent-child relationship . . . . This court finds as a matter of law that this principle should extend not only to state actors, but to private individuals as well. Here, while the [respondent's] conduct is reprehensible as a father figure, [the petitioner] resisted, especially over the past three years, any meaningful, cooperative visitation relationship between the [respondent] and his children." (Internal quotation marks omitted.) Id., 346.

As to the respondent's conceded lack of a relationship with his younger child, therefore, the court reasoned that "[i]t is not hard to understand why [the child] may have limited recollection of [the respondent]. The petitioner cannot be permitted to prevent visitation and thence to allege that the [respondent's] parental rights should be terminated for failing to maintain a relationship. . . .

"For those two reasons, the existence of positive present memories or feelings of the children (or at least one of them), and the conduct and attitude of the petitioner to frustrate the visitation of the father, the court concludes that the petitioner has not met her burden of proving by clear and convincing evidence that a statutory ground has been satisfied." Id.

In the present case, although we accept the court's finding that Carla has no present positive feelings for the respondent, such a finding was virtually inevitable given the petitioner's successful campaign, from the time Carla was a toddler until the adjudication date, to exclude the respondent from the child's life. See id.; cf. *In re Valerie D.*, supra, 223 Conn. 531. Notwithstanding the hurdles erected by the petitioner, the respondent has demonstrated his positive feelings toward Carla through his varied efforts to maintain contact with her. Given Carla's very young age at the time the petitioner began denying the respondent visitation and the respondent's demonstrated attempts to maintain contact in light of the limited means at his disposal, we conclude that under the circumstances of this case, the petitioner could not prove the lack of an ongoing parent-child relationship by clear and convincing evidence. Accordingly, the court's termination of parental rights on this ground cannot stand.[26]

The petitioner nevertheless argues that a custodial

parent's interference with the development of a parent-child should be viewed differently from the interference that occurred in *In re Valerie D.*, in which the respondent was pitted against the power of the state. We disagree. Whether the party seeking termination of an individual's parental rights is the commissioner or the custodial parent, the state's interest in preserving family integrity remains the same. See *In re Caleb P.*, supra, 53 Conn. Supp. 346. Accordingly, the Supreme Court's observation in *In re Valerie D.* is no less applicable here: "To permit [the respondent's] acquiescence [to the petitioner's assumption of sole custody] to ripen into a ground for termination of parental rights . . . simply by virtue of the practical impossibility of maintaining the kind of contact with the child required to establish an ongoing parent-child relationship, would turn the statutory promise of appropriate care for the child into a cruel statutory hoax of termination of parental rights." *In re Valerie D.*, supra, 223 Conn. 534.

Indeed, in *In re Jessica M.*, our Supreme Court observed that a stringent standard for establishing no ongoing parent-child relationship is equally vital where the party petitioning for termination is the child's relative: "When a child is committed to the custody of the state, the state has a duty to provide supportive services to the parents to enhance the possibility of eventual reunification of the family. . . . Although we recognize that no such statutory duty exists when . . . legal guardianship of the child is vested in a private party, the public policy concern for protection of familial integrity is nevertheless the same. If a court were authorized to find that day-to-day absence alone proved that no ongoing parent child relationship existed, a parent whose child needed a temporary placement would otherwise have to consider the risk that his or her parental rights might be terminated if the guardian subsequently wished to adopt. Such a standard for termination would create an incentive for a parent to yield temporary custody to a stranger rather than to an interested relative who might develop a strong bond with the child. *Creating a disincentive for a parent to choose the guardian most likely to love and protect the child while the parent was unable to provide daily care* would contravene the state's interests in protecting both family integrity and the best interests of the child." (Citation omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *In re Jessica M.*, supra, 217 Conn. 470–71.

The petitioner also argues that where a custodial parent petitions for termination on the ground of no ongoing parent-child relationship, a court must ignore the "root cause" of the lack of a relationship to safeguard the custodial parent's constitutional rights "to determine that a prison was a harmful environment for a child, that a sick child should not travel and have visits, or that a mother should be able to refuse calls

and contact from a man who had physically abused her." We are not persuaded. First, under certain circumstances, it has been recognized that "[t]he logistics of prison visits with young children, particularly to out-of-state facilities, [may] limit their feasibility." *In re Elvin G.*, 310 Conn. 485, 515, 78 A.3d 797 (2013); see also *In re Luciano B.*, 129 Conn. App. 449, 461, 21 A.3d 858 (2011) (finding that Department of Children and Families made reasonable efforts to reunify incarcerated parent and child even though it could not offer more frequent visitation because of distance, child's young age, and difficulty getting child into prison system). In the present case, however, there was no evidence that such visits were infeasible.

Second, a custodial parent's resort to protective measures, where necessitated by the other parent's violent or threatening behavior, is distinguishable from efforts to alienate a child from the noncustodial parent that may "[raise] significant issues" as to the establishment of a ground for termination. See *In re Jaime S.*, 120 Conn. App. 712, 731 and n.10, 994 A.2d 233 (2010) (concluding that fact that petitioner, who "had been forced to seek refuge in a shelter as a consequence of the father's behavior," and subsequently "took steps to protect herself and the parties' child from the father," did not undermine finding of abandonment ground for termination of father's parental rights), appeal dismissed, 300 Conn. 294, 12 A.3d 566 (2011). Indeed, where there is a protective order in place, the burden is on the respondent to seek modification of the protective order or face a finding of no ongoing parent-child relationship. See *In re Alexander C.*, supra, 67 Conn. App. 425–27. In any event, in the present case, there is no evidence in the record of a protective order or other safety measures undertaken by the petitioner as a result of behavior by the respondent.[27]

Third, although the asserted immateriality of the "root cause" of the lack of an ongoing parent-child relationship may be facially consistent with our Supreme Court's reading of this ground "to contemplate a situation in which, regardless of fault, a child . . . has never known his or her [parent]"; *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 670; our precedents make clear that a court is in no way required to ignore whether conduct *by another actor* thwarted the respondent parent's efforts to maintain a parent-child relationship. Rather, as we repeatedly have noted throughout this opinion, evidence as to the existence of a parent-child relationship must be viewed in light of such conduct, regardless of whether the actor is the state or the child's parent.

C

Although we conclude that the petitioner may not establish the lack of an ongoing parent-child relationship on the basis of her own interference with the

respondent's efforts to maintain contact with Carla, we express no opinion as to whether it would be in Carla's best interest to allow further time for the development of a parent-child relationship, or, relatedly, to permit visitation with the respondent in prison.[28] As we have noted previously in this opinion, "consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination." *In re Jessica M.*, supra, 217 Conn. 465. Similarly, in determining compliance with this particular standard for termination, whether it is in the child's best interest to allow time for future development of the parent-child relationship "does not become relevant until after it has been determined that no parent-child relationship exists." *In re Michael M.*, supra, 29 Conn. App. 128. Conversely, "[a]lthough a best interests of the child analysis is irrelevant in determining whether an ongoing parent-child relationship exists, it is relevant, and perhaps dispositive, in matters of visitation . . . ." (Citation omitted; internal quotation marks omitted.) *In re Jessica M.*, supra, 475.

For all of the foregoing reasons, the court improperly determined that the alleged grounds for termination of the respondent's parental rights had been established.

The judgment is reversed and the case is remanded with direction to render judgment denying the petition and to make a determination on the respondent's motion for visitation.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** July 22, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 45a-717 (g) (2) (B) provides that this ground for termination of parental rights is established by clear and convincing evidence that "the child has been denied, by reason of an act or acts of parental commission or omission, including, but not limited to sexual molestation and exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ."

[2] General Statutes § 45a-717 (g) (2) (C) provides that this ground for termination of parental rights is established by clear and convincing evidence that "there is no ongoing parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child . . . ."

[3] After the drive-by shooting, the respondent, who was on probation for a prior conviction, fled to New York, where he was arrested on a charge of violation of probation and jailed at Rikers Island. He was arrested in Connecticut in connection with the drive-by shooting after the New York authorities returned him to Connecticut.

[4] The respondent previously had been convicted of crimes in this state and in Florida. On March 9, 2006, in Osceola County, Florida, he was convicted of aggravated assault with a weapon and sentenced to nineteen months

incarceration. On January 18, 2008, in the judicial district of Litchfield, he was convicted of conspiracy to sell a controlled substance in violation of General Statutes §§ 21a-277 (a) and 53a-48 (a), and was sentenced to five years incarceration, execution suspended after eighteen months, and three years probation.

[5] While the petitioner obtained and settled into new housing, she sent Carla to Florida to stay with the petitioner's mother. Carla returned to Connecticut in early July, 2014. Dorothy Sekulski, a social worker for the Department of Children and Families, who completed a social study for the termination of parental rights and testified at the termination trial, reported in the social study and testified that during Carla's absence from Connecticut, the petitioner was evasive in response to Sekulski's questions about Carla's whereabouts and when she would return.

[6] Although the trial exhibits in the record do not include any motions for contempt, the court found that "[i]n the past, [the respondent] has commenced litigation in Superior Court . . . to petition for visitation with Carla," and the petitioner conceded that the respondent "tried to file motions a couple times, and there was a court order."

[7] There is no indication in the record that the court found the petitioner in contempt.

[8] As to the May 19, 2013 visit, the petitioner testified that although she prepared Carla for pickup by the respondent's mother, who was to transport Carla to the prison, the respondent's mother did not arrive at the appointed time. As to the November 24, 2013 visit, the petitioner testified that although Carla was ill and could not attend the visit anyway, the respondent's mother, who again was to transport Carla to the prison, notified the petitioner that she could not facilitate the visit.

[9] The respondent was not, in fact, convicted of risk of injury to a child, and there is no evidence in the record that a child was present in the house at the time of the drive-by shooting.

[10] The respondent has not challenged on appeal the court's determination that termination was in Carla's best interest.

[11] The respondent also argues that this ground may not be established under the circumstances of this case as a matter of statutory construction. Because we agree with the respondent that this ground may not be established as a matter of law, we need not address his statutory construction argument.

[12] The trial court treated the petition as having been brought pursuant to General Statutes § 17a-112, which is the applicable termination statute when the child has been committed to the custody of the Commissioner of Children and Families. See General Statutes § 17a-112 (j) (3) (C) (act of parental commission or omission) and (D) (no ongoing parent-child relationship). This court has "applied the same analytical framework" to petitions to terminate parental rights pursuant to §§ 17a-112 and 45a-717, the relevant language of which is "nearly identical." *In re Lukas K.*, 120 Conn. App. 465, 483 n.10, 992 A.2d 1142 (2010), aff'd, 300 Conn. 463, 14 A.3d 990 (2011).

[13] For the respondent to prevail on appeal, he "must successfully challenge both of the bases of the judgment terminating [his] parental rights. . . . If either of the grounds on which the trial court relied [is] upheld on appeal, the termination of parental rights must stand." (Citation omitted; internal quotation marks omitted.) *In re Lukas K.*, 120 Conn. App. 465, 484 n.11, 992 A.2d 1142 (2010), aff'd, 300 Conn. 463, 14 A.3d 990 (2011).

[14] In the present case, the respondent does not challenge on appeal the trial court's conclusion that termination of his parental rights was in Carla's best interest.

[15] Although the court stated that the drive-by shooting occurred in May, 2009, the respondent's criminal conviction case detail that was introduced into evidence at the trial on the petition shows that the date of the drive-by shooting was in January, 2009. The discrepancy is immaterial because both dates precede Carla's birth.

[16] The respondent contends that our resolution of this claim is a matter simply of extending to the facts of the present case our Supreme Court's reasoning in *In re Valerie D.*, supra, 223 Conn. 532, in which the court held that the state may not create the lack of an ongoing parent-child relationship and then terminate parental rights on that ground. We nevertheless resolve the respondent's claim by consideration of the definition of no ongoing parent-child relationship as it has evolved through our appellate cases, including *In re Valerie D.*

[17] The court also concluded that to allow additional time for a parent-child relationship to develop would be detrimental to Carla's best interest

because of the respondent's "criminal propensities and abject recidivism
. . . ." More specifically, the court found that the respondent's "election to
put criminal activity ahead of fatherhood establishes that he has not yet
acquired minimal parental attributes, and that he cannot and will not, within
a reasonable time, develop the ability or willingness to provide Carla with
the structured home environment and therapeutic resources that she
requires. . . . To allow further time would be detrimental to Carla's personal stability." (Citation omitted.)

[18] "This 'no-fault' statutory ground for termination was added . . . in 1974
. . . . Prior versions of [the statute] had provided for termination of parental
rights, absent consent of the parents, only upon such so-called 'fault' grounds
as abandonment, neglect, unfitness, or continuing physical or mental disability." (Footnote omitted.) *In re Juvenile Appeal (Anonymous)*, supra, 177
Conn. 669.

[19] As noted previously in this opinion, an "ongoing parent-child relationship" is defined as "the relationship that ordinarily develops as a result of
a parent having met on a continuing, day-to-day basis the physical, emotional,
moral and educational needs of the child . . . ." General Statutes § 45a-
717 (g) (2) (C). Our Supreme Court, with the legislature's acquiescence,
effectively has relaxed the requirement that a noncustodial parent's provision for a child's needs be on a "continuing, day-to-day basis" where visitation
rights are limited: "Our 1979 decision in *In re Juvenile Appeal (Anonymous)*,
supra, 177 Conn. 675, expressly rejected the trial court's determination that
no ongoing parent-child relationship meant no *meaningful* relationship.
. . . In 1983, the Connecticut legislature considered an amendment, contained in House Bill No. 7130, that would have effectively overruled our
holding in that case by substituting the phrase meaningful relationship
between parent and child for ongoing parent-child relationship, by minimizing the role of the child's memories and feelings for the natural parent, and
by minimizing the significance of parental contact through visitation. After
public hearings in which at least one advocate referred to this court's decision and urged the legislature to reconsider the proposed change in the law
because it would undermine the ability of parents to present evidence to
prevent the termination of their parental rights, the proposed bill was subsequently amended to reinstate the original language of the statute regarding
the ground permitting termination on the basis of no ongoing parent-child
relationship. See 26 S. Proc., Pt. 12, 1983 Sess., pp. 4145–47; 26 H.R. Proc.,
Pt. 24, 1983 Sess., pp. 8671–75. The relevant statutory language defining no
ongoing parent child relationship has not been amended since 1983. Because
the legislature was aware of our decision and chose not to amend the
language we had construed, we conclude that the legislature has effectively
signalled its agreement with our interpretation." (Citation omitted; emphasis
in original; footnotes omitted; internal quotation marks omitted.) *In re Jessica M.*, supra, 217 Conn. 471–72. The legislature has not amended its definition of an ongoing parent-child relationship since the Supreme Court's
decision in *In re Jessica M.*

[20] Finally, the court in *In re Jessica M.*, supra, 217 Conn. 475, noted that
although the ability and willingness of the guardians to adopt the child might
be relevant to a best interest determination, it was irrelevant to determining
whether an ongoing parent-child relationship existed.

[21] At the time, the commissioner was known as the Commissioner of
Children and Youth Services.

[22] The respondent had pleaded guilty to sexually abusing the child's half
sister, after which he was incarcerated, and a protective order was entered
that prohibited any contact between him and the children. *In re Alexander
C.*, supra, 67 Conn. App. 419.

[23] We note that in both *In re Jessica M.* and *In re Alexander C.*, the
outcome turned on whether the petitioner had met the stringent standard
of proof for establishing a ground for termination of parental rights whereas
the outcome in *In re Valerie D.* turned on the court's construction of the
statutory scheme.

[24] See *Hibbard* v. *Hibbard*, 139 Conn. App. 10, 19, 55 A.3d 301 (2012) ("[A]
person may not pick and choose which court orders [s]he will obey. . . .
A party's opinion concerning the necessity for a particular order does not
excuse [her] disobedience. . . . There is no privilege to disobey a court's
order because the alleged contemnor believes that it is invalid . . . [or]
should not be obeyed." [Internal quotation marks omitted.]).

[25] Although it is undisputed that the visits ordered by the court pursuant
to the respondent's motions for contempt, to take place on specific dates
in May and November, 2013, did not occur, it is unclear from the record

why those visits failed to take place, and the trial court made no factual finding in that regard. Nevertheless, it is undisputed that the respondent has not seen Carla since August, 2011, and, therefore, that none of the bimonthly visits provided for in the June, 2012 stipulation have taken place. As noted previously in this opinion, the petitioner acknowledged repeatedly that she had decided to stop the visits because she decided that visits were not in Carla's best interest and no longer wanted the respondent as a father figure in Carla's life.

[26] Because we conclude that the petitioner could not prove that no ongoing parent-child relationship existed under these circumstances, we need not consider the respondent's alternative argument that the trial court improperly terminated his parental rights solely on the basis of his incarceration. Nevertheless, we note that "the fact of incarceration, in and of itself, cannot be the basis for a termination of parental rights." *In re Elvin G.*, 310 Conn. 485, 514–15, 78 A.3d 797 (2013). "On the other hand, the inevitable restraints imposed by incarceration do not in themselves excuse a failure to make use of available though limited resources for contact with a distant child." *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 443, 446 A.2d 808 (1982). In accord with these principles, in each case upholding the termination of an incarcerated parent's parental rights on the ground of no ongoing parent-child relationship, this court has emphasized that the parent made little or no effort to work within the limitations he faced in order to maintain a relationship with his child. See *In re Lukas K.*, supra, 120 Conn. App. 486; *In re Alexander C.*, supra, 67 Conn. App. 425. A custodial parent's unilateral decision to end visitation, of course, cannot reasonably be considered an inevitable restraint of incarceration.

[27] We do not take lightly the court's finding that the respondent was the aggressor in a relationship between the parties that was marked by domestic violence, as a result of which the petitioner remains fearful of him. Nevertheless, nothing in the record indicates that this is a case in which, as the petitioner argues, "denying the other parent visitation may be necessary to insulate a custodial parent from being held responsible for failing to protect the parties' child." For example, there is no evidence that the respondent behaved inappropriately or threateningly toward Carla during any of their visits or that the petitioner's defiance of the visitation order and subsequent motion to suspend visitation were motivated by safety concerns.

[28] As noted previously in this opinion, the respondent moved for an order of visitation with Carla pending the resolution of the petition for termination of parental rights, which motion was consolidated with the petition for trial. In light of its decision terminating the respondent's parental rights, no ruling on the motion for visitation was necessary.

———————————————