In re Tresin J.

# IN RE TRESIN J.*

## (SC 20267)

Robinson, C. J., and Palmer, McDonald, Kahn and Ecker, Js.

*Syllabus*

The respondent father appealed to the Appellate Court from the trial court's
judgment terminating his parental rights with respect to his minor child,
T. The respondent had been incarcerated when T was two years old,
and T had last spoken with the respondent around that time. While
the respondent was incarcerated, T was placed in the custody of the
petitioner, the Commissioner of Children and Families, after the peti-
tioner became aware that T's mother, who was the custodial parent, was
experiencing mental health and substance abuse issues. The petitioner
thereafter filed a petition to terminate the respondent's parental rights
on the statutory (§ 17-112 [j] [3] [D]) ground that he had no ongoing
parent-child relationship with T. In terminating the respondent's parental
rights with respect to T, the trial court found that T, who was six years
old at the time of the termination hearing, did not know who his father
was or have any positive parental memories of the respondent. On
appeal, the respondent claimed, inter alia, that the trial court, in conclud-
ing that he had no ongoing parent-child relationship with T, failed to
consider the petitioner's interference with the development of that rela-
tionship and his own positive feelings toward T in light of T's young
age at the time the respondent was incarcerated. The Appellate Court
disagreed and affirmed the trial court's judgment, concluding that there
was no evidence that the respondent sought visitation with or attempted
to contact T while he was incarcerated, and that there was no evidence
that T's mother, who had custody of T during that period, had interfered
with the development of an ongoing parent-child relationship, or that
the petitioner's alleged interference led to the lack of such relationship.
On the granting of certification, the respondent appealed to this court.
*Held* that the Appellate Court properly upheld the trial court's termina-
tion of the respondent's parental rights on the ground that there was
clear and convincing evidence of a lack of an ongoing parent-child
relationship, and the virtual infancy and interference exceptions to the
lack of an ongoing parent-child relationship ground for termination did
not apply in this case: at the time of the termination hearing, T had no

* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the Appellate Court.

In re Tresin J.

knowledge or memory of the respondent as his father; moreover, the virtual infancy exception did not apply because, although T was two years old when he was separated from the respondent as a result of his incarceration, it is the child's age at the time of the termination hearing that controls for purposes of that exception, and T was six years old at the time of the respondent's termination hearing and able to communicate that he lacked present memories of the respondent as his parent; furthermore, the respondent could not prevail on his claim that the interference exception applied on the basis of the apparent inability of T's mother to foster a relationship between T and the respondent during the respondent's incarceration, as that exception is triggered only by the conduct of the petitioner rather than that of a third party or some other external factor that occasioned the separation between parent and child.

(*Three justices concurring separetely in one opinion*)

Argued September 18—officially released December 31, 2019**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, and tried to the court, *C. Taylor, J.*; judgment terminating the respondents' parental rights, from which the respondent father appealed to the Appellate Court, *DiPentima, C. J.*, and *Alvord* and *Beach, Js.*, which affirmed the trial court's judgment, and the respondent father, on the granting of certification, appealed to this court. *Affirmed.*

*David J. Reich*, assigned counsel, for the appellant (respondent father).

*Sara Nadim*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Clare Kindall*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

ROBINSON, C. J. In this certified appeal, we consider whether the parental rights of a father were properly

** December 31, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

In re Tresin J.

terminated for lack of an ongoing parent-child relationship when, at the time of the termination trial, the six year old child had no knowledge or memory of his father, who had been incarcerated when the child was two years old. The respondent father, Aceion B., appeals, upon our grant of his petition for certification,[1] from the judgment of the Appellate Court affirming the judgment of the trial court in favor of the petitioner, the Commissioner of Children and Families, which terminated his parental rights as to the child, Tresin J., pursuant to General Statutes § 17a-112 (j) (3) (D).[2] *In*

___

[1] We originally granted the respondent's petition for certification, limited to the following issue: "Did the Appellate Court correctly conclude that the trial court, which terminated the respondent father's parental rights based on the absence of an ongoing parent-child relationship, was not required to apply the infancy exception recognized in *In re Carla C.*, 167 Conn. App. 248, 143 A.3d 677 (2016)?" *In re Tresin J.*, 331 Conn. 909, 202 A.3d 1022 (2019).

We note that the original certified question does not completely reflect the issues in this appeal, particularly in the wake of our decision in *In re Jacob W.*, 330 Conn. 744, 762–64, 200 A.3d 1091 (2019), which clarified that there exist two distinct exceptions to the lack of an ongoing parent-child relationship ground for the termination of parental rights, for virtual infancy and interference. Indeed, the Appellate Court considered the interference claims; see *In re Tresin J.*, 187 Conn. App. 804, 811–13, 203 A.3d 711 (2019); which the petitioner briefed in this certified appeal and which we understand to be factually and legally intertwined with the respondent's virtual infancy claims in light of *In re Jacob W.* Accordingly, our analysis in this appeal reflects a rephrasing of the certified question to address the interference exception, as well. See, e.g., *In re Jacob W.*, supra, 747 n.1 (court may rephrase certified questions).

[2] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis

In re Tresin J.

*re Tresin J.*, 187 Conn. App. 804, 805–806, 203 A.3d 711 (2019). Relying on the Appellate Court's decision in *In re Carla C.*, 167 Conn. App. 248, 143 A.3d 677 (2016), the respondent claims that the trial court should have applied the virtual infancy and interference exceptions to the lack of an ongoing parent-child relationship ground for the termination of parental rights because Tresin was only two years old when the respondent's incarceration separated them, and the circumstances of this case, particularly the deficiencies of Tresin's mother, rendered contact impossible during his incarceration. In light of our recent explication of these exceptions in *In re Jacob W.*, 330 Conn. 744, 200 A.3d 1091 (2019), we disagree with the respondent's claims. Accordingly, we affirm the judgment of the Appellate Court.

The record and the Appellate Court's opinion set forth the following background facts and procedural history. "Tresin was born in June, 2011. The respondent last spoke to Tresin in April, 2013, when Tresin was less than two years old. In May, 2013, the respondent was convicted of possession of marijuana, his probation was revoked,[3] and he was sentenced to a term of incarceration. The respondent subsequently was taken into custody by federal authorities and detained for immigration violations. The respondent remained in federal custody until the fall of 2017."[4] (Footnote in original.) *In re Tresin J.*, supra, 187 Conn. App. 806.

---

the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

[3] "The respondent previously had been convicted of drug related offenses. In 2008, the respondent was convicted of possession of marijuana, and in 2011, he was convicted of possession of marijuana with intent to sell." *In re Tresin J.*, supra, 187 Conn. App. 806 n.2.

[4] We note that the respondent testified at trial that he had been released from federal immigration custody after the United States Court of Appeals for the Second Circuit determined that his offenses were not deportable in nature. The respondent did not, however, introduce evidence of the federal

In re Tresin J.

The Department of Children and Families (department) became involved with Tresin in May, 2015. The department initiated an investigation when it was notified after one of Tresin's half siblings was not picked up from school on time. The department learned during its investigation that Tresin and his two half siblings were not up to date medically and that Tresin's mother recently had been evicted and had been experiencing substance abuse difficulties; it referred her to mental health and substance abuse treatment programs, but she failed to comply with those programs' requirements over the ensuing year. Tresin's mother subsequently failed to arrange mental health evaluations and care for Tresin's older half sibling, who had been experiencing severe behavioral issues in school over the course of that year. In July, 2016, the department invoked a ninety-six hour hold with respect to Tresin and his two half siblings after Tresin's mother informed her caseworker that her life was in danger and she planned to flee the state with the children.

Subsequently, the petitioner "filed a neglect petition with respect to Tresin and his two [half siblings], who were in the care of Tresin's mother. In addition, the petitioner obtained an order of temporary custody with respect to all three children.

"In August, 2017, the petitioner filed a petition to terminate the parental rights of the respondent. The

court's judgment affording him relief, and the trial court deemed his immigration status "precarious," there being "[n]o credible evidence . . . produced to show that his future residence in this country is anything other than uncertain." Our independent research has confirmed the existence of a Second Circuit decision concluding that the United States Immigration Court had committed reversible error in denying the respondent's application for deferral of removal to Jamaica under the Convention Against Torture. See *Brown* v. *Lynch*, 665 Fed. Appx. 19, 20–21 (2d Cir. 2016). We agree with the trial court, however, that there is no evidence in the record confirming that this is the decision that definitively granted him relief from deportation or otherwise indicating his immigration status after the Second Circuit's remand of his case to the Immigration Court.

In re Tresin J.

petitioner alleged that, pursuant to § 17a-112 (j) (3) (D), the respondent had no ongoing parent-child relationship with Tresin. The termination of parental rights trial was held on February 5 and March 9, 2018.

"In a thoughtful memorandum of decision, issued on May 22, 2018, the court found that the petitioner had proved by clear and convincing evidence that there was no ongoing parent-child relationship with respect to the respondent and Tresin. In reaching its conclusion, the court found that 'Tresin does not know who his father is and has no positive parental memories of his biological father.' "[5] Id., 806–807.

The respondent appealed from the judgment terminating his parental rights to the Appellate Court, claiming that the trial court incorrectly "determined, pursuant to § 17a-112 (j) (3) (D), that no ongoing parent-child relationship exists between the respondent and Tresin."[6] Id., 808–809. The respondent argued specifically that the trial court's conclusion was inconsistent with the Appellate Court's decision in *In re Carla C.*, supra, 167 Conn. App. 248, because the trial court failed to consider "(1) the petitioner's interference with the development of the parent-child relationship between himself and Tresin, and (2) Tresin's young age, in light of which the respondent's feelings toward Tresin are significant." *In re Tresin J.*, supra, 187 Conn. App. 809. The Appellate Court rejected the respondent's arguments, observing first that he "presented no evidence that he sought visitation or attempted to call Tresin during those three years [that he was incarcerated]. The respondent does not allege any interference by the

[5] "The [trial] court also determined that it would be detrimental to Tresin's best interests to allow further time for a relationship with the respondent to develop. The respondent does not challenge this determination." *In re Tresin J.*, supra, 187 Conn. App. 807 n.3.

[6] "The parental rights of Tresin's mother also were terminated, and she has not appealed." *In re Tresin J.*, supra, 187 Conn. App. 806 n.1.

In re Tresin J.

child's mother, who had custody of Tresin during that time.'' Id., 811. The Appellate Court also emphasized that the petitioner had ''presented undisputed evidence that, in July, 2016, when Tresin was placed into the petitioner's custody and before any alleged interference took place, Tresin did not know who his father was. Therefore, unlike in *In re Carla C.*, the respondent did not present evidence that the petitioner's alleged interference *led to* the lack of an ongoing parent-child relationship between the respondent and Tresin.'' (Emphasis in original.) Id., 811–12. Accordingly, the Appellate Court affirmed the judgment of the trial court, having concluded that ''the trial court properly applied the law . . . and that its legal conclusion that the petitioner established the elements of § 17a-112 (j) (3) (D) [was] supported by clear and convincing evidence.'' Id., 813. This certified appeal followed. See footnote 1 of this opinion.

On appeal, the respondent relies on the Appellate Court's decision in *In re Carla C.*, supra, 167 Conn. App. 248, and claims that the virtual infancy exception to the lack of an ongoing parent-child relationship ground for the termination of parental rights is applicable to this case because Tresin, like the child in *In re Carla C.*, was two years old when the respondent was incarcerated, meaning that both the trial court and the Appellate Court improperly focused on Tresin's lack of memory of the respondent at the time of trial rather than the respondent's positive feelings for Tresin. The respondent argues that the dispositive issue ''is whether the child was old enough to remember [his or her] father when he was separated from the child,'' rendering the age of the child at separation the controlling factor. The respondent also contends that the trial court should have applied the interference exception by considering the abilities of the custodial parent at the time of separation. Specifically, he argues that Tresin's mother,

334 Conn. 314 JANUARY, 2020 321

In re Tresin J.

although not actively interfering in their relationship, was unable to facilitate visits while he was incarcerated.

In response, the petitioner contends that the Appellate Court's decision is in full accord with the legal analysis set forth in *In re Jacob W.*, supra, 330 Conn. 744, and *In re Carla C.*, supra, 167 Conn. App. 248. The petitioner argues that *In re Carla C.* is factually distinguishable because the present case lacks "interference by any party to the proceeding" prior to the institution of termination proceedings, and, as of the day of removal, "Tresin already had no positive memories of [the respondent, and], thus no ongoing parent-child relationship already existed." The petitioner also contends that the virtual infancy exception is inapplicable because Tresin was six years old at the time of the termination trial and could communicate his present feelings. To this end, the petitioner relies on *In re Carla C.* and *In re Alexander C.*, 67 Conn. App. 417, 787 A.2d 608 (2001), aff'd, 262 Conn. 308, 813 A.2d 87 (2003), and argues that incarceration does not trigger the virtual infancy exception, even when the incarceration and separation occur during infancy. Instead, the petitioner emphasizes that, in such cases, the applicable exception is interference, with consideration given to deliberate interference by the petitioner and the efforts, or lack thereof, by the respondent to maintain a relationship during the period of incarceration.[7] We agree with

_____

[7] The petitioner also relies on the trial court's finding "by clear and convincing evidence that no parental relationship ever existed between [the] respondent and Tresin" because, inter alia, the respondent "has never extended paternal support to the child and has never provided or shown interest in providing necessities to meet his daily needs." The petitioner suggests that the trial court, as the finder of fact, did not find credible the respondent's testimony that he had purchased diapers, clothes, and toys at the request of Tresin's mother and "pretty much [did] everything for Tresin before [he] was incarcerated." The trial court's decision not to credit the respondent's testimony on this point does not—in the absence of other evidence—support the opposite factual proposition, namely, that the petitioner has never provided material support to Tresin. See, e.g., *Ventura* v. *East Haven*, 330 Conn. 613, 641–42, 199 A.3d 1 (2019) ("although the plaintiff is correct that the

In re Tresin J.

the petitioner and conclude that the respondent was not entitled to invoke the interference or virtual infancy exceptions to the lack of an ongoing parent-child relationship ground for the termination of his parental rights.

"We begin with the applicable standard of review and general governing principles. Although the trial court's subordinate factual findings are reviewable only for clear error, the court's ultimate conclusion that a ground for termination of parental rights has been proven presents a question of evidentiary sufficiency. . . . That conclusion is drawn from both the court's factual findings and its weighing of the facts in considering whether the statutory ground has been satisfied. . . . On review, we must determine whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . To the extent we are required to construe the terms of [§ 17a-112 (j) (3) (D)] or its applicability to the facts of this case, however, our review is plenary. . . .

"Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . .

---

jury was free to disbelieve all or any portion of [the witness'] testimony, it was not permitted to draw a contrary inference on the basis of that disbelief" [internal quotation marks omitted]). Nevertheless, this is harmless error because it remains undisputed that Tresin had no present memory of or positive feelings toward the respondent, which provides an independent statutory ground for the judgment terminating his parental rights.

In re Tresin J.

grounds for termination of parental rights set forth in
§ 17a-112 [(j) (3)] exists by clear and convincing evi-
dence. The commissioner . . . in petitioning to termi-
nate those rights, must allege and prove one or more
of the statutory grounds. . . . Subdivision (3) of § 17a-
112 (j) carefully sets out . . . [the] situations that, in
the judgment of the legislature, constitute countervail-
ing interests sufficiently powerful to justify the termina-
tion of parental rights in the absence of consent. . . .
Because a respondent's fundamental right to parent his
or her child is at stake, [t]he statutory criteria must be
strictly complied with before termination can be accom-
plished and adoption proceedings begun.'' (Citations
omitted; internal quotation marks omitted.) *In re Egypt
E.*, 327 Conn. 506, 525–27, 175 A.3d 21, cert. denied sub
nom. *Morsy E.* v. *Commissioner, Dept. of Children &
Families*, U.S. , 139 S. Ct. 88, 202 L. Ed. 2d
27 (2018).

We begin with a review of the lack of an ongoing
parent-child relationship ground and its exceptions.
Section 17a-112 (j) provides in relevant part: ''The Supe-
rior Court, upon notice and hearing as provided in sec-
tions 45a-716 and 45a-717, may grant a petition filed
pursuant to this section if it finds by clear and convinc-
ing evidence that (1) the Department of Children and
Families has made reasonable efforts to locate the par-
ent and to reunify the child with the parent in accor-
dance with subsection (a) of section 17a-111b, unless
the court finds in this proceeding that the parent is
unable or unwilling to benefit from reunification efforts,
except that such finding is not required if the court has
determined at a hearing pursuant to section 17a-111b,
or determines at trial on the petition, that such efforts
are not required, (2) termination is in the best interest
of the child, and (3) . . . (D) there is no ongoing par-
ent-child relationship, which means the relationship
that ordinarily develops as a result of a parent having

In re Tresin J.

met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . .''

In *In re Jacob W.*, supra, 330 Conn. 754–55, we recently considered the application of the near identical lack of an ongoing parental relationship provision in General Statutes § 45a-717 (g) (2) (C), which governs actions for termination of parental rights brought in Probate Court by private petitioners.[8] We discussed our previous decisions in *In re Valerie D.*, 223 Conn. 492, 613 A.2d 748 (1992), *In re Jessica M.*, 217 Conn. 459, 586 A.2d 597 (1991), and *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 420 A.2d 875 (1979), along with the Appellate Court's decision in *In re Carla C.*, supra, 167 Conn. App. 248, and explained that the ''inquiry . . . is a two step process. First, the court must determine whether the petitioner has proven the lack of an ongoing parent-child relationship. Only if the court answers that question in the affirmative may it turn to the second part of the inquiry, namely, whether allowance of further time for the establishment or reestablishment of the relationship would be contrary to the child's best interests. . . .

''In interpreting the parameters of [§ 17a-112 (j) (3) (D)], we must be mindful of what is at stake. [T]he termination of parental rights is defined . . . as the complete severance by court order of the legal relation-

_____

[8] Because the provisions governing the termination of parental rights under § 17a-112, which governs petitions regarding children previously committed to the custody of the department, and § 45a-717, which is ''the correspondent statute for proceedings in the Probate Court'' that governs such petitions brought by private parties; *In re Egypt E.*, supra, 327 Conn. 529; are virtually identical, case law applying either statute is instructive in termination of parental rights cases. See, e.g., id.; *In re Valerie D.*, 223 Conn. 492, 497 n.3, 613 A.2d 748 (1992); *In re Brian T.*, 134 Conn. App. 1, 12 n.3, 38 A.3d 114 (2012).

In re Tresin J.

ship, with all its rights and responsibilities, between the child and his parent . . . . It is, accordingly, a most serious and sensitive judicial action. . . . Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. . . .

"Moreover . . . the fact of incarceration, in and of itself, cannot be the basis for a termination of parental rights. . . . At the same time, a court properly may take into consideration the inevitable effects of incarceration on an individual's ability to assume his or her role as a parent. . . . Extended incarceration severely hinders the department's ability to offer services and the parent's ability to make and demonstrate the changes that would enable reunification of the family. . . . This is particularly the case when a parent has been incarcerated for much or all of his or her child's life and, as a result, the normal parent-child bond that develops from regular contact instead is weak or absent. . . . .

"The lack of an ongoing parent-child relationship is a no fault statutory ground for the termination of parental rights. . . . This court has explained that the ground of no ongoing parent-child relationship for the termination of parental rights contemplates a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. . . . *The ultimate question is whether the child has some present memories or feelings for the natural parent that are positive in nature. . . .*

"In its interpretation of the language of [the lack of an ongoing parent-child relationship ground], this court has been careful to avoid placing insurmountable burden[s] on noncustodial parents. . . . Because of that concern, we have explicitly rejected a literal interpretation of the statute, which defines the relationship as one that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child . . . . [D]ay-to-day absence alone, we clarified, is insufficient to support a finding of no ongoing parent-child relationship. . . . We also have rejected the notion that termination may be predicated on the lack of a *meaningful* relationship, explaining that the statute requires that there be *no* relationship." (Citations omitted; emphasis altered; internal quotation marks omitted.) *In re Jacob W.*, supra, 330 Conn. 755–58; see *In re Jessica M.*, supra, 217 Conn. 470 ("It is not unlikely that most parent-child relationships in which state intervention is required, including custody disputes incidental to divorce, will exhibit signs of strain. While evidence of a child's ambivalent feelings toward a noncustodial parent would not alone justify a finding that 'no ongoing parent-child relationship' exists, it is nevertheless reasonable to construe this statutory ground for termination to require a finding that no positive emotional aspects of the relationship survive.").

We summarized our analysis in *In re Jacob W.* by reciting "the proper legal test to apply when a petitioner seeks to terminate a parent's rights on the basis of no ongoing parent-child relationship . . . . We reiterate[d] that the inquiry is a two step process. In the first step, a petitioner must prove the lack of an ongoing parent-child relationship by clear and convincing evidence. In other words, the petitioner must prove by clear and convincing evidence that the child has no present memories or feelings for the natural parent that

In re Tresin J.

are positive in nature. If the petitioner is unable to prove a lack of an ongoing parent-child relationship by clear and convincing evidence, the petition must be denied, and there is no need to proceed to the second step of the inquiry. If, and only if, the petitioner has proven a lack of an ongoing parent-child relationship does the inquiry proceed to the second step, whereby the petitioner must prove by clear and convincing evidence that to allow further time for the establishment or reestablishment of the relationship would be contrary to the best interests of the child. Only then may the court proceed to the disposition phase.

"There are two exceptions to the general rule that the existence of an ongoing parent-child relationship is determined by looking to the present feelings and memories of the child toward the respondent parent. The first exception . . . applies when the child is an infant, and that exception changes the focus of the first step of the inquiry. . . . [W]hen a child is virtually a newborn infant whose present feelings can hardly be discerned with any reasonable degree of confidence, it makes no sense to inquire as to the infant's feelings, and the proper inquiry focuses on whether the parent has positive feelings toward the child. . . . Under those circumstances, it is appropriate to consider the conduct of a respondent parent.[9]

"The second exception . . . applies when the petitioner has engaged in conduct that inevitably has led to the lack of an ongoing parent-child relationship

_____

[9] This virtual infancy inquiry, which focuses on the conduct of the respondent parent rather than the present feelings and memories of the child, is akin to the separate abandonment ground for the termination of parental rights set forth in §§ 45a-717 (g) (2) (C) and 17a-112 (j) (3) (A). See *In re Jacob W.*, supra, 330 Conn. 768 ("[a]n inquiry similar to that of the abandonment ground cannot be applied to assess whether a petitioner has established a lack of an ongoing parent-child relationship unless the child is an infant at the time of the inquiry").

In re Tresin J.

between the respondent parent and the child. This exception precludes the petitioner from relying on the lack of an ongoing parent-child relationship as a basis for termination. Under these circumstances, even if neither the respondent parent nor the child has present positive feelings for the other, and, even if the child lacks any present memories of the respondent parent, the petitioner is precluded from relying on [the lack of an ongoing parent-child relationship] as a basis for termination.'' (Citation omitted; footnote added; internal quotation marks omitted.) *In re Jacob W.*, supra, 330 Conn. 762–64. The interference ''inquiry properly focuses not on the petitioner's intent in engaging in the conduct at issue, but on the consequences of that conduct. *In other words, the question is whether the petitioner engaged in conduct that inevitably led to a noncustodial parent's lack of an ongoing parent-child relationship*. If the answer to that question is yes, the petitioner will be precluded from relying on the ground of 'no ongoing parent-child relationship' as a basis for termination regardless of the petitioner's intent—or not—to interfere.'' (Emphasis added.) Id., 762.

Applying these principles to the present case,[10] we begin with the respondent's claim that the virtual

---

[10] The respondent argues that our recent decision in *In re Jacob W.*, supra, 330 Conn. 744, does not control because it was decided after both the termination trial and the appeal before the Appellate Court in this case had concluded. We disagree. It is a well established general principle that ''a rule enunciated in a case presumptively applies retroactively to pending cases,'' which includes decisions interpreting existing statutes. (Internal quotation marks omitted.) *State* v. *Elias G.*, 302 Conn. 39, 45, 23 A.3d 718 (2011); see id., 45–46 (concluding that this court's interpretation of juvenile transfer statute applied retroactively to certified appeal that was pending when decision was issued). The defendant has not advanced any specific arguments seeking relief from that general rule, and none is apparent to us on the record of the present case, insofar as *In re Jacob W.* broke no new ground but instead represents a distillation of existing case law. Cf. *Campos* v. *Coleman*, 319 Conn. 36, 61, 123 A.3d 854 (2015) (discussing ''the [three part] test set out in *Chevron Oil Co.* v. *Huson*, 404 U.S. 97, 92 S. Ct. 349, 30 L. Ed. 2d 296 [1971], for determining whether a decision must be applied prospectively only . . . [under which a] common-law decision will be

In re Tresin J.

infancy exception to the lack of an ongoing parent-child relationship ground applies because Tresin was two years old when the respondent was incarcerated. We disagree. This claim is squarely controlled by *In re Jacob W.*, in which we rejected a parent's claim that the virtual infancy exception applied when the parent was separated from the child by incarceration when the child was one year old and the termination hearing was held when the child was four years old. Id., 767–68 and n.5. We emphasized in *In re Jacob W.* that it was not the child's "age at the time of the respondent's incarceration three years prior to the termination hearing that controls for purposes of the application of the virtual infancy exception, but [the child's] age . . . at the time of the termination hearing. To determine whether a petitioner has established the lack of an ongoing parent-child relationship, the trial court must be able to discern a child's present feelings toward or memories of a respondent parent. The virtual infancy exception takes account of the particular problem that is presented when a child is too young to be able to articulate those present feelings and memories. . . . . It would make no sense to require a trial court to resolve whether a child's feelings *could have been determined* at some time prior to the termination hearing. The inability of the court to discern or to be presented with evidence regarding a virtual infant's *present* feelings drives the exception. *That finding must be made at the time of the termination hearing.*" (Citation omitted; emphasis altered.) Id., 768 n.5.

applied nonretroactively only if: [1] it establishes a new principle of law, either by overruling past precedent on which litigants have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . . [2] given its prior history, purpose and effect, retrospective application of the rule would retard its operation; and [3] retroactive application would produce substantial[ly] inequitable results, injustice or hardship" [internal quotation marks omitted]). But cf. *In re Daniel N.*, 323 Conn. 640, 652–53, 150 A.3d 657 (2016) (discussing retroactive application of decisions in which this court exercises its supervisory authority over administration of justice).

In re Tresin J.

Having reviewed the record, we conclude that it amply supports the trial court's conclusion, upheld by the Appellate Court, that the virtual infancy exception did not apply in this case. As of the time of the termination trial in February and March of 2018, Tresin was six years old, and the respondent had not spoken or visited with him since August, 2013, prior to his incarceration, when Tresin was two years old. The department's social study, which was admitted into evidence, noted that "Tresin has not seen his father since he was two years old. Tresin would not recognize his father, as [the respondent] is essentially a stranger to Tresin. *Tresin does not have any positive memories of his time with his father, and, at the time of his removal in July of 2016, Tresin was unclear about the identity of his father and believed that his father was a long-term boyfriend of [his mother], who was not [the respondent].*" (Emphasis added.) We conclude, therefore, that the virtual infancy exception does not apply in this case because Tresin was six years old at the time of trial and able to communicate that he lacked present memories of the respondent as his parent.[11]

[11] Even if we were to conclude that the virtual infancy exception applies as a matter of law, rendering the respondent's testimony about his positive feelings toward Tresin relevant to this appeal, we note that "the parent's perpetuation of the lack of a relationship by failing to use available resources to seek visitation or otherwise maintain contact with the child may establish the lack of an ongoing parent-child relationship." *In re Carla C.*, supra, 167 Conn. App. 272–73. "[E]vidence of the existence of a parent-child relationship is to be viewed in the light of circumstances that limited visitation . . . including the conduct of the child's custodian at the time of the petition." (Citation omitted.) Id., 273. The record indicates that the respondent was represented by counsel during his immigration proceedings and had relatives in the Hartford area, including a sister whom he had identified as a potential placement resource for Tresin. There is, however, no evidence that the respondent attempted to use those resources to foster a relationship with Tresin, regardless of the apparent inability of Tresin's mother to assist in that capacity. As his attorney conceded at oral argument before this court, the respondent's lack of effort was consistent with his belief that he was going to be deported to Jamaica after his imprisonment. See footnote 4 of this opinion. Accordingly, we disagree with the respondent's argument that the trial court improperly found that he lacked the requisite positive feelings

In re Tresin J.

Compare *In re Jacob W.*, supra, 330 Conn. 768 n.5 ("The trial court had no difficulty discerning [the four year old child's] present memories of or feelings toward the respondent. The court expressly found that [the child] had 'little to no memory' of him. Accordingly, there was no need to apply the virtual infancy exception."), with *In re Jessica M.*, supra, 217 Conn. 474 (guardians of child who petitioned to terminate mother's parental rights could not rely on lack of ongoing parent-child relationship ground when trial court's findings "indicate that the child recognizes the respondent as her mother, that she would suffer some sense of loss if not permitted to visit with her, and that the relationship between the child and her mother is 'an affectionate one and one of mutual interest' ").

We also disagree with the respondent's contention that the interference exception applies because of the apparent inability of Tresin's mother to foster their relationship during the respondent's incarceration. He argues that Tresin's mother, although not actively interfering in their relationship, "was barely able to parent her children" and lacked "the wherewithal or

toward Tresin with respect to the lack of an ongoing parent-child relationship ground. See *In re Ilyssa G.*, 105 Conn. App. 41, 47–48, 936 A.2d 674 (2007) (The lack of an ongoing parent-child relationship ground supported the termination of the respondent father's parental rights when he had not seen his nine year old child since she was one year old, and "his efforts to be involved in her life consisted of visiting the department once in 2004, more than one year after she had been removed from her mother's care, and calling the residential care facility where the child was to inquire about her care. The respondent also admitted that he had not informed the department or anyone else involved with the case of his whereabouts after he had moved from his last address on file."), cert. denied, 285 Conn. 918, 943 A.2d 475 (2008); *In re Alexander C.*, supra, 67 Conn. App. 425–27 (concluding that "the record does not reveal that the respondent had positive feelings toward the child" because, during his term of incarceration, he did not seek modification of protective order entered in light of allegations of his physical and sexual abuse of infant child's sibling, did not inquire about child's health or well-being, and did not seek out "parenting classes that would promote the development of a relationship . . . [or] inquire about the availability of individual counseling or sex offender treatment classes available at his correctional facility").

In re Tresin J.

motivation to try to contact [the respondent] when he was in prison. As a result, [the respondent] had no knowledge regarding Tresin until the department obtained custody of Tresin. Once Tresin was in custody, [the respondent] kept in contact with the department and requested contact with his son.'' Our case law makes clear that the interference exception is akin to the equitable doctrine of "clean hands" and is triggered only by the conduct of the petitioner rather than that of a third party or some other external factor that occasioned the separation.[12] Compare *In re Jacob W.*, supra, 330 Conn. 766–67 (interference exception was inapplicable to grandparent petitioners who "played no role in setting the protective order" that effectively precluded respondent father from contacting children during his incarceration), and *In re Alexander C.*, supra, 67 Conn. App. 424–25 (interference exception was inapplicable because, although child was placed in foster care within days of birth, "the respondent, rather than the commissioner, created the circumstances that caused and perpetuated the lack of an ongoing relationship'' by committing physical and sexual abuse of minor child's sibling that resulted in his incarceration and entry of protective order), with *In re Valerie D.*, supra, 223 Conn.

---

[12] By reference to his Appellate Court brief, we note that the respondent obliquely argues that the actions of the department also constituted interference with his attempts to reestablish contact with Tresin. Specifically, the respondent argues that, after the department located him in federal immigration custody in Alabama, he expressed interest in having contact with Tresin, but the department "made no efforts to allow [him] to have any contact and opposed [his] efforts to have contact." We disagree with this reading of the interference exception, which applies when the actions of the petitioner rendered inevitable the *initial* lack of a relationship, which in this case had occurred several years before the department became involved with the respondent and his family. See *In re Jacob W.*, supra, 330 Conn. 766–67; *In re Valerie D.*, supra, 223 Conn. 533–34. Put differently, it was not the department's opposition to visitation on the recommendation of Tresin's clinicians, who deemed it potentially disruptive to the progress that he was making with his foster mother, which resulted in the separation that led to the lack of a parent-child relationship.

In re Tresin J.

531–34 (department was precluded from relying on lack of ongoing parent-child relationship ground when it took temporary custody of child within days of her birth because of mother's continued cocaine use, with only few months having elapsed between department taking custody and termination hearing, because "once the child had been placed in foster care . . . a finding of a lack of an ongoing parent-child relationship three and one-half months later was inevitable . . . because absent extraordinary and heroic efforts by the respondent, the petitioner was destined to have established the absence of such a relationship"), and *In re Carla C.*, supra, 167 Conn. App. 253–56, 262 (interference exception was applicable when petitioner mother, who was custodial parent, obtained order from prison in which respondent father was incarcerated barring him from all oral or written communication with her and child, discarded cards and letters that he sent to child, and filed motion to suspend child's visitation with father on ground that it was "unworkable"). We conclude, therefore, that the Appellate Court properly upheld the trial court's termination of the respondent's parental rights on the ground that there was clear and convincing evidence of a lack of an ongoing parent-child relationship, with the interference and virtual infancy exceptions being inapplicable as a matter of law.[13]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

[13] We agree with Justice Ecker's apt observation that "the social reality operating beneath the surface of . . . cases involving incarcerated parents who lose their children as a collateral consequence of the separation that incarceration entails" presents a serious question of public policy, and we join him in commending it to the legislature for further study. See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 438–39, 119 A.3d 462 (2015) (noting "the legislature's primary responsibility in pronouncing the public policy of our state" and that legislature is better positioned to "evaluate . . . competing policy interests" [internal quotation marks omitted]).

In re Tresin J.

ECKER, J., with whom PALMER and McDONALD, Js., join, concurring. I agree with and join Chief Justice Robinson's opinion holding that neither the virtual infancy nor the interference exception to the statutory lack of an ongoing parent-child relationship ground for the termination of parental rights is applicable to the facts of this case, and, therefore, I am compelled to conclude that the parental rights of the respondent father, Aceion B., properly were terminated, even though he was incarcerated for most of his young child's life. I write separately to describe very briefly the social reality operating beneath the surface of this and many other such cases involving incarcerated parents who lose their children as a collateral consequence of the separation that incarceration entails. The problem I describe is not, in my opinion, well suited for judicial resolution on a case-by-case basis in the first instance, at least in the absence of more particularized legislative guidance regarding the proper legal considerations and standards that judges should take into account when deciding these cases. A legislative solution also offers the advantage of including nonjudicial remedial components that the legislature may deem necessary and appropriate on the basis of the many policy considerations that presumably would inform any such initiative.

There are approximately 2.2 million people incarcerated in the United States, and more than half of them have children under the age of eighteen. E. Hager & A. Flagg, The Marshall Project, "How Incarcerated Parents Are Losing Their Children Forever," (December 2, 2018), available at http://www.themarshallproject.org/2018/12/ 03/how-incarcerated-parents-are-losing-their-children -forever (last visited December 30, 2019); see also 3 M. Mushlin, Rights of Prisoners (4th Ed. 2009) § 16:4, pp. 488–90. Of the estimated 74 million children in the United States in 2007, 2.3 percent, or approximately 1.7 million children, had an incarcerated parent. L. Glaze &

334 Conn. 314          JANUARY, 2020          335

In re Tresin J.

L. Maruschak, Office of Justice Programs, United States Department of Justice, ''Parents in Prison and Their Minor Children,'' Bureau Just. Stat. Spec. Rep. (Rev. March 30, 2010) p. 2, available at http://www.bjs.gov /content/pub/pdf/pptmc.pdf (last visited December 30, 2019). These statistics are even bleaker in minority communities; ''[one] in [ten] black children have a parent behind bars, compared with about [one] in [sixty] white youth . . . .'' E. Hager & A. Flagg, supra.[1]

The rise in incarceration rates over the past fifty years has been the subject of much attention and controversy. See, e.g., National Research Council et al., ''The Growth of Incarceration in the United States: Exploring Causes and Consequences'' (J. Travis et al. eds. 2014) p. 260 (reporting on recent study showing that number of children with father in prison rose from 350,000 in 1980 to 2.1 million in 2000, or ''about 3 percent of all U.S. children in 2000''). Whatever its causes, the rise in the United States prison population has coincided with changes in child welfare policy, which are intended ''to reduce children's stay in foster care in favor of a permanent home . . . .'' A. Iskikian, Note, ''The Sentencing Judge's Role in Safeguarding the Parental Rights of Incarcerated Individuals,'' 53 Colum. J.L. & Soc. Probs. 133, 135 (2019). Under the Adoption and Safe Families Act, for example, ''the State shall file a petition to terminate the parental rights of'' a parent whose child ''has been in foster care under the responsibility of the State for 15 of the most recent 22 months . . . .''[2]

_____

[1] The statistics recited in this concurring opinion reflect national data and are not specific to Connecticut. I would be surprised if the relevant statistics in Connecticut differed materially from the national numbers, but I cannot be certain because the local information is not readily available. The need for more empirical information of this kind is another reason why the legislature is far better equipped in the first instance to consider the matter and devise proper legal standards for case-by-case application.

[2] Connecticut has codified this federal statutory requirement at General Statutes § 17a-111a (a), which provides in relevant part that ''[t]he Commissioner of Children and Families shall file a petition to terminate parental rights pursuant to section 17a-112 if (1) the child has been in the custody of the commissioner for at least fifteen consecutive months, or at least

In re Tresin J.

42 U.S.C. § 675 (5) (E) (2012). Because the average sentence of incarceration exceeds fifteen months,[3] incarcerated parents whose children are placed in foster care have their parental rights terminated at a "disproportionate rate . . . ." A. Iskikian, supra, 135. Indeed, "[o]ne in eight children placed into foster care due to a parent's incarceration alone will lose that parent forever." E. Hager & A. Flagg, supra. "Female prisoners, whose children are five times more likely than those of male inmates to end up in foster care, have their rights taken away most often." Id.

Part of the problem fueling this "family separation crisis"; (internal quotation marks omitted) id.; is the fact that many termination of parental rights statutes, like General Statutes § 17a-112 (j) (3) (D), focus on the existence of an "ongoing parent-child relationship." See generally G. Sarno, Annot., "Parent's Involuntary Confinement, or Failure to Care for Child As Result Thereof, As Evincing Neglect, Unfitness, or the Like in Dependency or Divestiture Proceeding,'' 79 A.L.R.3d 417 (1977). In Connecticut, an "ongoing parent-child relationship" is statutorily defined as "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child . . . ." General Statutes § 17a-112 (j) (3) (D). A parent who is separated from his or her child by a sentence of incarceration cannot develop and/or maintain the type of parent-child relationship that ordinarily results from day-to-day contact. Although this court has been careful to "avoid

fifteen months during the twenty-two months, immediately preceding the filing of such petition . . . ."

[3] "The average time served by state prisoners released in 2016, from their date of initial admission to their date of initial release, was 2.6 years. The median amount of time served (the middle value in the range of time served, with 50 [percent] of offenders serving more and 50 [percent] serving less) was 1.3 years . . . ." D. Kaeble, Bureau of Justice Statistics, Office of Justice Programs, "Time Served in State Prison, 2016," U.S. Dept. Just. Bull., November, 2018, p. 1, available at http://www.bjs.gov/content/pub/pdf/tssp16.pdf (last visited December 30, 2019).

In re Tresin J.

placing insurmountable burden[s] on noncustodial parents'' by ''explicitly reject[ing] a literal interpretation of the statute,'' we nonetheless find ourselves constrained by the language of the statute to require, at the very least, a showing that ''the child has some present memories or feelings for the natural parent that are positive in nature.'' (Internal quotation marks omitted.) *In re Jacob W.*, 330 Conn. 744, 757, 200 A.3d 1091 (2019).

I am inclined to believe that many incarcerated parents—including loving and devoted parents—could have tremendous difficulty making the required showing under some circumstances. As this court has acknowledged, ''when a parent has been incarcerated for much or all of his or her child's life . . . the normal parent-child bond that develops from regular contact . . . is weak or absent.'' (Internal quotation marks omitted.) Id., 756–57. The fact of incarceration also interferes with ''the parent's ability to make and demonstrate the changes that would enable reunification of the family''; (internal quotation marks omitted) id., 756; because incarcerated parents cannot attend juvenile court hearings, visit the child, attend parenting classes, or provide financial support. A. Iskikian, supra, 53 Colum. J.L. & Soc. Probs. 158–59. ''Parents in prison thus face a high likelihood of incurring the double punishment of both incarceration and the permanent deprivation of their relationship[s] with their children.'' Id., 165–66. Depending on the age of the child, the financial resources of the family, the willingness of the custodial parent or guardian to facilitate contact, and the resourcefulness of the incarcerated parent and his or her ability to navigate the maze of logistical impediments that accompany the loss of liberty in prison, it may be difficult or impossible for the incarcerated parent to meet the existing statutory standard.

Several states have responded to this increasingly serious problem by enacting legislation to protect the fundamental rights of incarcerated parents and to pre-

338 JANUARY, 2020 334 Conn. 314

In re Tresin J.

serve the parent-child bond. For example, California and New York have enacted legislation requiring that incarcerated parents be provided with reunification services, such as parenting classes and visitation with their minor children. See Cal. Welf. & Inst. Code § 361.5 (e) (1) and (2) (Deering Supp. 2018);[4] N.Y. Soc. Serv. Law

[4] Section 361.5 (e) of the California Welfare and Institutions Code provides in relevant part: "(1) If the parent or guardian is incarcerated, institutionalized, or detained by the United States Department of Homeland Security, or has been deported to his or her country of origin, the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child. In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime or illness, the degree of detriment to the child if services are not offered and, for children 10 years of age or older, the child's attitude toward the implementation of family reunification services, the likelihood of the parent's discharge from incarceration, institutionalization, or detention within the reunification time limitations described in subdivision (a), and any other appropriate factors. In determining the content of reasonable services, the court shall consider the particular barriers to an incarcerated, institutionalized, detained, or deported parent's access to those court-mandated services and ability to maintain contact with his or her child, and shall document this information in the child's case plan. Reunification services are subject to the applicable time limitations imposed in subdivision (a). Services may include, but shall not be limited to, all of the following:

"(A) Maintaining contact between the parent and child through collect telephone calls.

"(B) Transportation services, when appropriate.

"(C) Visitation services, when appropriate.

"(D) (i) Reasonable services to extended family members or foster parents providing care for the child if the services are not detrimental to the child.

"(ii) An incarcerated or detained parent may be required to attend counseling, parenting classes, or vocational training programs as part of the reunification service plan if actual access to these services is provided. The social worker shall document in the child's case plan the particular barriers to an incarcerated, institutionalized, or detained parent's access to those court-mandated services and ability to maintain contact with his or her child.

"(E) Reasonable efforts to assist parents who have been deported to contact child welfare authorities in their country of origin, to identify any available services that would substantially comply with case plan requirements, to document the parents' participation in those services, and to accept reports from local child welfare authorities as to the parents' living situation, progress, and participation in services.

In re Tresin J.

§ 384-b (7) (f) (McKinney Cum. Supp. 2019).[5] Nebraska and New Mexico have gone even further by enacting legislation prohibiting the state from terminating parental rights if the sole basis for the termination is parental incarceration. See Neb. Rev. Stat. § 43-292.02 (2) (b)

---

"(2) The presiding judge of the juvenile court of each county may convene representatives of the county welfare department, the sheriff's department, and other appropriate entities for the purpose of developing and entering into protocols for ensuring the notification, transportation, and presence of an incarcerated or institutionalized parent at all court hearings involving proceedings affecting the child pursuant to Section 2625 of the Penal Code. The county welfare department shall utilize the prisoner locator system developed by the Department of Corrections and Rehabilitation to facilitate timely and effective notice of hearings for incarcerated parents."

[5] Section 384-b (7) (f) of the New York Social Services Law requires an "authorized agency" of the state to make " 'diligent efforts' . . . to assist, develop and encourage a meaningful relationship between the parent and child" by "(5) making suitable arrangements with a correctional facility and other appropriate persons for an incarcerated parent to visit the child within the correctional facility, if such visiting is in the best interests of the child. When no visitation between child and incarcerated parent has been arranged for or permitted by the authorized agency because such visitation is determined not to be in the best interest of the child, then no permanent neglect proceeding under this subdivision shall be initiated on the basis of the lack of such visitation. Such arrangements shall include, but shall not be limited to, the transportation of the child to the correctional facility, and providing or suggesting social or rehabilitative services to resolve or correct the problems other than incarceration itself which impair the incarcerated parent's ability to maintain contact with the child. When the parent is incarcerated in a correctional facility located outside the state, the provisions of this subparagraph shall be construed to require that an authorized agency make such arrangements with the correctional facility only if reasonably feasible and permissible in accordance with the laws and regulations applicable to such facility; and

"(6) providing information which the authorized agency shall obtain from the office of children and family services, outlining the legal rights and obligations of a parent who is incarcerated or in a residential substance abuse treatment program whose child is in custody of an authorized agency, and on social or rehabilitative services available in the community, including family visiting services, to aid in the development of a meaningful relationship between the parent and child. Wherever possible, such information shall include transitional and family support services located in the community to which an incarcerated parent or parent participating in a residential substance abuse treatment program shall return."

In re Tresin J.

(Cum. Supp. 2018);[6] N.M. Stat. Ann. § 32A-4-28 (D) (2010).[7]

Within constitutional limits, it is a question of public policy how best to strike the appropriate balance between and among the competing values and interests at stake, and, "[i]n areas where the legislature has spoken . . . the primary responsibility for formulating public policy must remain with the legislature." *State* v. *Whiteman*, 204 Conn. 98, 103, 526 A.2d 869 (1987). As I previously explained, § 17a-112 (j) (3) (D) in its present form plainly provides for the termination of parental rights if, among other things, the child has no positive memories or feelings for the natural parent. Despite the nearly insurmountable hurdles posed by incarceration to many inmates who find themselves unable in the prison setting to develop and maintain the parental relationship necessary to satisfy the statutory standard, I agree with Chief Justice Robinson's opinion holding that the trial court did not commit error applying the statutory standard on this record. Accordingly, I concur in Chief Justice Robinson's opinion.

––––––––––––––––

[6] Section 43-292.02 (2) (b) of the Nebraska Revised Statutes provides in relevant part that "[a] petition shall not be filed on behalf of the state to terminate the parental rights of the juvenile's parents or, if such petition has been filed by another party, the state shall not join as a party to the petition if the sole factual basis for the petition is that . . . the parent or parents of the juvenile are incarcerated. . . ."

[7] Section 32A-4-28 (D) of the New Mexico Statutes Annotated provides that "[t]he department shall not file a motion, and shall not join a motion filed by another party, to terminate parental rights when the sole factual basis for the motion is that a child's parent is incarcerated."