******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

WILLIS CAVANAGH *v.* JOSEPH RICHICHI,
COTRUSTEE, ET AL.
(AC 44344)

Bright, C. J., and Clark and DiPentima, Js.

*Syllabus*

The plaintiff sought a partition by sale, pursuant to statute (§ 52-500 (a))
of certain real property in which he and the defendants each held an
ownership interest. Between the years 2001 and 2019, the defendants
B, G, and N Co. invested hundreds of thousands of dollars for the upkeep,
maintenance, and improvement of the waterfront property to support
a marine based business and also paid all of the real estate taxes on
the property. The trial court found that the plaintiff and the defendants
M and P had been passive owners and had minimal interests in the
property as compared to B, G, and N Co. and determined that the
equitable distribution of the minimal interests of the plaintiff and M and
P to B, G, and N Co. in exchange for just compensation would better
promote the relative interests of the parties. Thereafter, the court
accepted an appraisal of the fair market value of the property and
awarded the plaintiff one third of that amount, reduced by a credit to
B, G, and N Co. for certain investments in the property and a set off
for the real estate taxes paid. The court declined to award the plaintiff
compensation for B, G, and N Co.'s use and occupancy of the property.
On the plaintiff's appeal to this court, *held*:

1. The trial court did not abuse its discretion in calculating its award of just
compensation to the plaintiff: contrary to the plaintiff's argument, the
court was not prohibited from crediting B, G, and N Co. for the costs
of improvements to the property in the absence of an agreement with
the plaintiff to share the cost of those improvements as there was no
marital relationship among the parties; moreover, the plaintiff provided
no authority for his assertion that the court was required to calculate
the amount of credit to B, G, and N Co. on the basis of the amount of
their expenditures for improvements rather than the extent to which
those expenditures enhanced the fair market value of the property;
furthermore, the court reasonably considered in its calculation the mar-
ket value of the property, the plaintiff's interest in the property, and the
costs and labor associated with the improvements, maintenance and
repairs made by B, G, and N Co. during their occupancy of the property
and found that much of the investment between 2000 and 2009 was
necessary for the property to be useable and, thus, that these expenses
benefited all the co-owners of the property.

2. The trial court did not abuse its discretion in declining to award the
plaintiff compensation for B, G, and N Co.'s use and occupancy of the
property: the plaintiff failed to prove the reasonable value owed to him
by B, G and N Co.; the court's finding that the testimony of the plaintiff's
real estate valuation expert as to the fair market rental value of the
property was not credible was fully supported by the evidence, including
the expert's use of a fair market value of the property that differed from
the court approved appraisal, the expert's determination of the fair
market rental value as if the plaintiff and B, G, and N Co. were the
landlord and tenants under a long-term ground lease rather than analyz-
ing comparable rentals, and the failure of the expert's analysis to con-
sider the actual condition of the property, although it assumed a maritime
commercial use of the property.

Argued January 3—officially released May 10, 2022

*Procedural History*

Action for the partition of certain of the parties' real
property, brought to the Superior Court in the judicial
district of Stamford-Norwalk, where the defendant New
NRB #3 Corporation et al. filed a counterclaim; there-
after, Patrick D. McCabe, cotrustee of the Hillard E.

Bloom Revocable Trust, was substituted for the named defendant; subsequently, the case was tried to the court, *Heller, J.*; judgment for the defendant New NRB #3 Corporation et al. on the complaint and on the counterclaim, from which the plaintiff appealed to this court. *Affirmed.*

*Douglas J. Varga*, for the appellant (plaintiff).

*Joseph DaSilva, Jr.*, with whom, on the brief, was *Marc J. Grenier*, for the appellees (defendant New NRB #3 Corporation et al.).

*Opinion*

CLARK, J. In this partition action, the plaintiff and counterclaim defendant, Willis Cavanagh (plaintiff), appeals from the judgment of the trial court ordering an equitable distribution of the property located at 120 Water Street in Norwalk (property). The trial court found that the plaintiff's interest in the property was minimal and ordered him to quitclaim his undivided one-third stake in the property to the defendants and counterclaim plaintiffs Robert Bloom and John Gardella, in their capacity as cotrustees of the Norman R. Bloom Revocable Trust, and to New NRB #3 Corporation (New NRB) (collectively, defendants), for just compensation.[1] On appeal, the plaintiff claims that the trial court erred in calculating the just compensation owed to him by (1) finding that the defendants were entitled to a credit of one third of the amount that they paid for improvements to the property, and (2) failing to award him any compensation for the defendants' use and occupancy of the property. We affirm the judgment of the trial court.

We begin by setting forth the relevant facts, as found by the trial court, in addition to the procedural history in this matter. The property is a 0.7 acre waterfront property located in the Norwalk Marine Commercial zone in Norwalk. The property has approximately 70 feet of frontage on Water Street and 150 feet of frontage on Norwalk Harbor. It is a narrow, mostly level, rectangular shaped lot. The land component of the property comprises about 75 percent of the parcel; the remaining 25 percent stretches into Norwalk Harbor. The property is improved with a small two-story building, a bulkhead, a boat lift, a sixty foot dock, and a sixty foot pier that extends into the harbor.

In 2011, the plaintiff, who owns a one-third interest in the property, commenced an action for a partition by sale of the subject property. At that time, Joseph Richichi and Leslie Miklovich, as cotrustees of the Hillard E. Bloom Revocable Trust (Hillard Bloom Trust), and the defendants, were named as defendants in light of their ownership interests in the property.

On June 26, 2013, Richichi and Miklovich filed an answer to the complaint, agreeing with the plaintiff that a partition by sale, with an equitable distribution of the proceeds, would better serve the interests of the co-owners than a partition in kind. On July 8, 2013, however, the defendants filed an answer, counterclaim, and cross claim in which they argued that a physical division of the property was not appropriate and that a partition by sale would not be in the interest of the owners. They alleged that the plaintiff's interest in the property was minimal, and, therefore, they were entitled to an order requiring the plaintiff to convey his interest in the property to them in exchange for fair compensation. The

defendants also asserted the right to a set off against any fair compensation due to the plaintiff for the amounts that they had spent for the upkeep, maintenance, and improvement of the property. The defendants asserted the same claims as cross claims against Richichi and Miklovich.

On December 22, 2014, Patrick D. McCabe filed a notice of death of Richichi, and McCabe thereafter succeeded Richichi as a cotrustee of the Hillard Bloom Trust.[2] On October 15, 2015, an amended complaint was served and filed to reflect this new interest, in addition to correcting a service issue as to Gardella, as cotrustee of the Norman Bloom Trust. Various counterclaims, answers, special defenses, and replies were filed. Of relevance to this appeal, the plaintiff filed revised special defenses to the defendants' operative counterclaim on August 16, 2016, which included, among other special defenses, that the defendants failed and refused to pay reasonable rents or use and occupancy to him, which amounts equal or exceed the value of any improvements to the property.

The action was tried to the court on August 17 and September 1, 2016, and January 10, 2017, and the court set a briefing schedule at the close of evidence. In a memorandum of decision dated September 5, 2017, the trial court, *Heller*, *J.*, evaluated whether a partition by sale or an equitable distribution, pursuant to General Statutes § 52-500 (a),[3] was appropriate. With respect to the plaintiff, the court found that, despite his ownership of "an undivided one-third—or 33.33 percent—interest in the . . . property," he had "a minimal interest in the . . . property" because, among other things, he failed "to contribute to the cost of the cleaning up [of] the . . . property and constructing and installing the improvements"; he failed "to pay any portion of the real estate taxes or the insurance premiums for the property"; he failed "to contribute to the cost of maintaining the . . . property"; and he "never sought access to the property." The court found that, "[w]hile [the plaintiff] has acted to assert his ownership interest in the . . . property—by prosecuting the 2002 quiet title action and this partition action—he has done nothing to enhance, protect or preserve the property itself. Although he is the plaintiff in this action, he did not testify or offer any evidence to show that he has been anything other than a passive owner of the . . . property."

In regard to the Hillard Bloom Trust cotrustees, the court found that they own "an undivided one-sixth— or 16.67 percent—interest in the . . . property." The court stated that McCabe or Miklovich, "individually or in their capacity as cotrustees of the Hillard Bloom Trust, have not had anything to do with the . . . property." The court stated that, like the plaintiff, "they did not testify at trial or offer any evidence to show that

they are not merely passive owners." The court found that they, too, had "a minimal interest in the . . . property."

With respect to the defendants, the court found that the Norman Bloom Trust cotrustees owned an undivided one-sixth interest in the property and that New NRB, an oyster and shellfishing company operated by Bloom, owned an undivided one-third interest in the property. Having found that the plaintiff and the Hillard Bloom Trust cotrustees had minimal interests in the property, the court had to determine, in accordance with § 52-500 (a), whether a sale would promote the interests of the defendants. If a sale *did not* promote their interests, the court *could* order an equitable distribution of such property. If a sale *would* promote their interests, an equitable distribution *would not* be appropriate. The court ultimately concluded that, pursuant to § 52-500 (a), the sale of the property would not promote the interests of the defendants, and it accordingly found that "the equitable distribution of the minimal interests of [the plaintiff] and the Hillard Bloom Trust cotrustees to the [the defendants] in return for just compensation [would] better promote the interests of the owners of the . . . property than would a partition by sale."

Instead of determining just compensation at that time, the court's memorandum of decision "direct[ed] the [defendants] to provide a current appraisal of the . . . property, prepared by . . . [Ronald] McInerney, for the consideration of the court and all parties within sixty days of the date of [its] memorandum of decision."[4] The court indicated that the parties would then be heard with respect to the just compensation to be paid to the plaintiff and to the Hillard Bloom Trust cotrustees for their interests in the property.

On October 27, 2017, the defendants filed an updated appraisal completed by McInerney dated October 25, 2017, which the trial court, *Hon. Kevin Tierney*, judge trial referee, accepted on December 20, 2017. The October 25 appraisal valued the property at $1,325,000. On March 16, 2018, before the hearing on just compensation was held, the Hillard Bloom Trust cotrustees entered into a stipulation with the defendants to resolve their claim to just compensation.

On October 8, 2019, the court held a hearing on the just compensation to be paid to the plaintiff, the defendants' claim that they were entitled to contributions for the amounts that they had spent for the upkeep, maintenance, and improvement of the property, and the plaintiff's claim that he should be compensated for the defendants' use and occupancy of the property. The court reserved decision at the conclusion of the hearing and set a posthearing briefing schedule.

In a memorandum of decision dated October 6, 2020,

the trial court, *Heller*, *J.*, accepted the updated October, 2017 appraisal completed by McInerney and found that the property had a fair market value of $1,325,000. The court stated: "Absent any credit, setoff or other equitable adjustment in favor of the [defendants], the value of [the plaintiff's] undivided one-third interest would be $441,667." However, the court explained that its "role in this partition action does not end with a simple mathematical calculation." It recognized that "[a] partition action requires that the court balance the equities between the parties." (Internal quotation marks omitted.)

With respect to whether the defendants were entitled to a setoff of the amounts that they spent for the upkeep, maintenance, and improvement of the property, including real estate taxes, the court explained that the defendants introduced evidence that they had spent $893,900 in labor and out-of-pocket expenses between 2000 and 2019, to restore and improve the property so that it could support a marine based business. The court found that Bloom had prepared invoices from Tallmadge Sea and Land, Bloom's marine construction company that completed most of the improvements, to New NRB, to keep track of the improvements that were made to the property and to support a claim for the value of the improvements in a partition action. Bloom testified that the invoices included a profit margin of around 10 percent.

In light of the evidence before it, and balancing the equities of the parties, the court ultimately found that "the [defendants] invested $728,609 in costs and labor to restore the . . . property."[5] (Footnote omitted.) The court found that the defendants were "entitled to a credit of one third of this amount—or $242,870—against the just compensation to be paid to [the plaintiff]." The court next found that the defendants paid "a total of $206,265.28 in real estate taxes . . . ." The court stated: "[The plaintiff] does not dispute that the [defendants] are entitled to set off one third of the total amount of real estate taxes that they paid during the period 2001 through 2019 against the amount due to him. Accordingly, there shall be an additional credit of $68,755 in favor of the [defendants]." (Footnote omitted.) After setting off all the credits to which the court found the defendants were entitled, the court ordered the defendants to pay just compensation to the plaintiff in the amount of $130,042.

In regard to the plaintiff's claim that the defendants should compensate him for their use and occupancy during the period January 1, 2020, through the present, the court found that he "failed to offer credible evidence to establish the fair market rental value of the . . . property." Accordingly, his claim was denied. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first argues that the trial court abused its discretion in calculating the plaintiff's just compensation by granting the defendants a credit of one third of the costs they claimed for improvements. In particular, the plaintiff argues that, because he was neither consulted about any improvements that were going to be made to the property nor did he consent to them, the defendants are not entitled, as a matter of law, to an allowance for improvements in determining the just compensation awarded to him. The plaintiff further argues that, to the extent a credit for improvements was permissible, the court erred in crediting the defendants on the basis of "the alleged amount of their expenditures, rather than the extent to which any such expenditures enhanced the fair market value of the property." In the plaintiff's view, "[t]he proper measure of any credit should have been calculated, if at all, with reference to the extent to which any 'improvements' increased the property's value, not the amount of costs and labor purportedly needed to make the improvements themselves." We disagree.

We begin by setting forth our standard of review and the legal principles that inform our discussion. A partition action is one of equity. As such, "[t]he determination of what equity requires is a matter for the discretion of the trial court." (Internal quotation marks omitted.) *DiCerto* v. *Jones*, 108 Conn. App. 184, 188, 947 A.2d 409 (2008). "In determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action. . . . Our review of a trial court's exercise of the . . . discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Internal quotation marks omitted.) *Segal* v. *Segal*, 86 Conn. App. 617, 630, 863 A.2d 221 (2004).

In Connecticut, the right to partition has long been recognized as absolute. See *Fernandes* v. *Rodriguez*, 255 Conn. 47, 55, 761 A.2d 1283 (2000) ("[t]he right to partition is well settled and its history has been documented thoroughly"); *Geib* v. *McKinney*, 224 Conn. 219, 224, 617 A.2d 1377 (1992) ("[t]he right to partition has long been regarded as an absolute right, and the difficulty involved in partitioning property and the inconvenience to other tenants are not grounds for denying the remedy"). Prior to 2004, the only two modes of relief available to parties in a partition action were partition by division of real estate and partition by sale. See *Fernandes* v. *Rodriguez*, supra, 57 ("[o]n the basis of the history of the right to partition, and in light of the legislative treatment of that right, we have held repeatedly that in resolving partition actions, the only two modes of relief within the power of the court are partition by division of real estate and partition by sale" (emphasis omitted)).

In 2004, however, a third mode of relief was added by the legislature. "[T]he legislature enacted Public Acts 2004, No. 04-93, § 1, which added the following sentence to General Statutes (Rev. to 2005) § 52-500 (a): 'If the court determines that one or more of the persons owning such real or personal property have only a minimal interest in such property and a sale would not promote the interests of the owners, the court may order such equitable distribution of such property, with payment of just compensation to the owners of such minimal interest, as will better promote the interests of the owners.' " *Fusco* v. *Austin*, 141 Conn. App. 825, 833, 64 A.3d 794 (2013). Accordingly, as this court explained in *Fusco*, § 52-500 (a), as amended, now "permits the court to order an equitable distribution of the property if it determines that one or more of the persons owning the property have only a minimal interest in the property and a sale would not promote the interest of the owners." (Emphasis omitted.) Id. If an equitable distribution is ordered, "payment of just compensation to the owners of such minimal interest" must be made. See General Statutes § 52-500 (a); see also *Fusco* v. *Austin*, supra, 833.

In a partition action, a court is required to "balance the equities between the parties." *Rissolo* v. *Betts Island Oyster Farms, LLC*, 117 Conn. App. 344, 353, 979 A.2d 534 (2009). As our Supreme Court has stated, "it is not always true that each tenant in common or joint tenant is entitled to equal shares in the real estate." *Fernandes* v. *Rodriguez*, supra, 255 Conn. 60. "Because a partition action is an equitable action, the court has the authority to determine an unequal award on the basis of the evidence presented, including the value of the property and the equitable interests of the parties." *Rissolo* v. *Betts Island Oyster Farms, LLC*, supra, 353–54; see also *Levay* v. *Levay*, 137 Conn. 92, 96, 75 A.2d 400 (1950) ("[a]lthough each party was the owner of an undivided one-half interest in the property, it does not follow that he or she will necessarily be entitled to equal shares of the moneys obtained from the sale"); see also *Hackett* v. *Hackett*, 42 Conn. Supp. 36, 40, 598 A.2d 1112 (1990), aff'd, 26 Conn. App. 149, 598 A.2d 1103 (1991), cert. denied, 221 Conn. 905, 600 A.2d 1359 (1992). Additionally, as our Supreme Court has explained in the context of our government takings jurisprudence, "[t]he question of what is just compensation is an equitable one rather than a strictly legal or technical one." (Internal quotation marks omitted.) *Alemany* v. *Commissioner of Transportation*, 215 Conn. 437, 444, 576 A.2d 503 (1990).

On appeal, the plaintiff takes exception to the court's award of just compensation.[6] In his view, the court abused its discretion by reducing his undivided one-third interest of the appraised property by $242,870— an amount the court found to be one third of the costs

of improvements that the defendants made to the property. In support of his argument, the plaintiff maintains that our Supreme Court's decision in *Neumann* v. *Neumann*, 134 Conn. 176, 55 A.2d 916 (1947), prohibited the trial court from crediting the defendants for costs of improvements to the property because *Neumann* stands for the proposition that, in the absence of an agreement to share the cost of improvements, a co-owner is not responsible for a proportionate share of the cost. We disagree.

In *Neumann*, "[a] wife, while living happily with her husband, transferred to him an undivided one-half interest in certain real estate in consideration of love and affection. She subsequently built a dwelling house on the land. In the course of its construction she was obliged to borrow $3500 to complete the building, and she executed, individually, a mortgage of the premises." Id., 177. There was eventually a breakdown in the relationship, the parties separated, and the wife instituted divorce proceedings. Id. The husband brought an action for a partition or sale of the property. Id. The trial court found that "[t]he [husband] owned an undivided one-half interest in the entire premises, including the house, and his interest was not subject to the mortgage; the property does not lend itself to a partition; and a sale and division of the proceeds will better promote the interests of the parties." Id., 177–78.

On appeal before our Supreme Court, the defendant wife argued that the court should have ordered a physical division of the land instead of a sale and a division of the proceeds. Id., 180. In determining whether a division of the property would have been more appropriate than a sale of the property, the court indicated that "a determination as to the ownership of the house would be a consideration which would enter into the question whether a division of the property was practicable." Id., 178. Our Supreme Court ultimately concluded that the trial court was correct in ordering a sale of the property. It stated: "No correction in the finding material to the issues before us can be made. The court has found that the defendant of her own volition and without previously consulting her husband began the construction of the house; that there never was any agreement that the building was to belong to the defendant; and that the plaintiff at no time agreed to reimburse the defendant for any moneys expended in the construction of the house. *Where one spouse puts up a building on land owned in common by husband and wife, without any understanding or agreement that the other shall share the expense, the presumption that it was for the joint benefit of both must prevail.*" (Emphasis added.) Id., 178–79. The court also made clear that the "obligation created by the mortgage would be an issue in the supplementary proceedings" when the court would determine the equitable divisions of the proceeds of the sale. Id., 178.

On the basis of our review of *Neumann*, we find the plaintiff's reliance on it misplaced. The central holding in *Neumann* was simply that there is a presumption that improvements made during a marriage by one spouse to property owned in common by both spouses are made for the benefit of both spouses and that the spouse who incurred expenses for those improvements is generally not entitled to a separate credit for those expenses, in the absence of some agreement or understanding to the contrary. It is manifest from the court's decision that the marital relationship between the parties was essential to the court's holding. The very presumption discussed was predicated on the fact that the parties were married at the time the expenditures were made. Thus, in the present matter, the plaintiff's contention that the trial court was not permitted to credit the defendants for improvements they made to the property, without his consent to those improvements, must be rejected, as no marital relationship was present.[7] It also bears reiterating that "[t]he determination of what equity requires is a matter for the discretion of the trial court" to be determined on a case-by-case basis. (Internal quotation marks omitted.) *DiCerto* v. *Jones*, supra, 108 Conn. App. 188 n.3.

Contrary to the plaintiff's contention, this court repeatedly has held that a trial court may take into consideration contributions, including improvements, that the parties have made to the subject property in its determination of just compensation. See, e.g., *Zealand* v. *Balber*, 205 Conn. App. 376, 393–94, 257 A.3d 411 (2021) ("[i]n light of those contributions, the court awarded the plaintiff $25,000 as just compensation"); *Young* v. *Young*, 137 Conn. App. 635, 651, 49 A.3d 308 (2012) (trial court properly considered plaintiff's expenditures related to upkeep, including mortgage payments, household repairs and grounds maintenance and taxes, against countervailing claims for use and occupancy); *Hackett* v. *Hackett*, 26 Conn. App. 149, 150, 598 A.2d 1103 (1991) (following partition sale, party may "be compensated out of the proceeds from the sale of the parties' jointly owned property for his past payments for mortgage, insurance, taxes, improvements and repairs"), cert. denied, 221 Conn. 905, 600 A.2d 1359 (1992).

For example, in *Hackett* v. *Hackett*, supra, 42 Conn. Supp. 39, the plaintiff requested the trial court to order that he be paid out of the proceeds from the sale of the parties' jointly owned property for his past payments for mortgage, insurance, taxes, improvements and repairs. The plaintiff neither alleged nor attempted to prove any agreement with the defendant to make any such contributions. Id., 46.

The court explained that when "a cotenant in possession invokes the jurisdiction of a court of equity to obtain contributions from the cotenant out of possession for funds expended for the betterment of the com-

mon interest, the cotenant out of possession may *defensively* charge the cotenant in possession with a part of the reasonable value of the occupancy or use by the cotenant in possession and in some cases may hold the cotenant in possession accountable for profits realized from the premises." (Emphasis in original.) Id., 50; see also General Statutes § 52-404 (b) ("[w]hen two or more persons hold property as joint tenants, tenants in common or coparceners, if one of them occupies, receives, uses or takes benefit of the property in greater proportion than the amount of his interest in the property, any other party and his executors or administrators may bring an action for an accounting or for use and occupation against such person and recover such sum or value as is in excess of his proportion").

In determining the equitable distribution of proceeds, the court in *Hackett* noted that the parties were divorced in 1978, and that the plaintiff ex-husband had been living at the subject property with their children from 1978 to 1989. *Hackett* v. *Hackett*, supra, 42 Conn. Supp. 46. He had "complete" use of the property and paid the expenses for the premises. Id. The defendant ex-wife lived in Waterbury. Id. The court found that "[t]he plaintiff and the defendant had a right to an undivided one half of [the] real estate." Id., 54. In balancing the equities of how the sale proceeds should be paid out, however, the trial court concluded that, "[a]s to the mortgage payment, which includes the taxes and insurance, to which [the defendant] has never contributed, her share of this obligation [was] . . . 50 percent of $39,875, which is $19,937.50.[8] . . . It is, therefore, concluded that the amount that the defendant must 'contribute' to the plaintiff out of the sales proceeds with reference to the mortgage, taxes and insurance claim of the plaintiff is $19,937.50."[9] (Footnote added.) Id. The court also ordered the defendant to pay 50 percent of the repairs and improvements made to the property by the plaintiff. Id., 55. The court stated that "[i]t seems fair to the court that from the defendant's share of the sales proceeds she 'contribute' 50 percent of these expenses, which is $1687.50, whether any or all of them be called an 'improvement' or 'repair.' All appear to be reasonable." Id. There was no discussion of how these repairs and improvements affected the sale price of the property. The defendant appealed.

On appeal to this court, the defendant in *Hackett* argued that the trial court erred in ordering that the plaintiff be compensated out of the proceeds from the sale of the parties' jointly owned property for his past payments for mortgage, insurance, taxes, improvements and repairs. See *Hackett* v. *Hackett*, supra, 26 Conn. App. 150. This court disagreed and stated that the "trial court's memorandum of decision thoughtfully and comprehensively addresse[d] both the factual questions and the legal issue raised by the defendants." Id., 151. We accordingly adopted the trial court's "well

reasoned decision as a statement of the facts and the applicable law." Id.

With this as our backdrop, we next address the plaintiff's contention that the court erred in crediting the defendants for their expenditures for improvements because it calculated the credit on the "the alleged amount of their expenditures, rather than the extent to which any such expenditures enhanced the fair market value of the property." In the plaintiff's view, "the proper measure of any credit should have been calculated, if at all, with reference to the extent to which any 'improvements' increased the property's value, not the amount of costs and labor purportedly needed to make the improvements themselves." We disagree.

On the basis of our review of the relevant authorities, we have not found, nor has the plaintiff directed us to any authority, that would require the trial court to calculate just compensation in such a highly technical or precise manner. In fact, this court rejected a similar claim in *DiCerto* v. *Jones*, supra, 108 Conn. App. 188 n.3, in which the defendant claimed, among other things, that "the court used an improper method for dividing the net partition proceeds" by awarding "each party half of the net partition proceeds after reimbursing him only for his initial expenditures." We stated that "[t]he defendant's argument [was] unpersuasive because the equities in partition actions are balanced by trial courts on a case-by-case basis. The fact that other trial courts may have ruled differently in the ultimate division of sale proceeds in a partition action does not require, in itself, a similar result in the present case." Id.

Here, in determining just compensation for the property, the court reasonably considered, inter alia, the market value of the property ($1,325,000); the interest that the plaintiff had in the property (one third); and the costs and labor associated with the improvements, repairs, and maintenance made by the defendants during their occupancy of the property. To be sure, the trial court found that, "[b]y 2000, it was not possible to operate any marine related business from the . . . property without dredging the seabed and removing all of the garbage, derelict boats, and debris left from [previous] operations that had accumulated over the years.[10] The existing bulkhead had deteriorated. A portion of the marine railway tracks and the old crane were still there. Foundation pilings remained in the water from a building that had been removed in the 1990s. . . . Bloom testified that everyone in the Bloom family was aware of the work that needed to be done on the . . . property." (Footnote added.)

In or about 2000–2001, "Bloom, through his marine construction company, Tallmadge Sea and Land Construction . . . began to clean up and restore the property with the help of his son and another man that he

worked with. He testified that the property was 'a mess' before they started clearing it. He was concerned at that time that the Norwalk Harbor Management Commission might take enforcement action against the . . . property. They filled up many thirty yard dumpsters with garbage and debris. They sent the derelict boats and the old crane to a scrap yard. They cleaned up the pilings on the land side of the property, where the marine railway had been, and extracted the foundation pilings that remained in the water with a crane or a vibratory hammer." (Footnote omitted.)

After obtaining permits in 2002–2003, the defendants began making various improvements to the property. In 2005, "Tallmadge Sea and Land removed the remains of the old bulkhead and the marine railway tracks from the . . . property. Using a crane that worked off land and a vibratory hammer to drive the sheets into the ground, they replaced the old bulkhead with a new sheet steel bulkhead. They also replaced two telephone poles, repaired the water line, and installed underground power lines and frost-free hydrants. After the new bulkhead was anchored, they installed a cap and fender system, a travel lift for hauling boats, and a pier. The pier is made of concrete, on wooden foundation pilings. It is sixty feet long and six feet wide. It extends into the water with an aluminum ramp and a wooden floating dock. The wooden floating dock was installed in October, 2006.

"The seabed portion of the . . . property was dredged in 2009 so that the property could be used for commercial boats. . . . Prior to the dredging . . . commercial fishing boats could not have been tied up to the pier or the dock. Due to the sediment that had built up over the years, even a personal pleasure boat would sit on the seabed at low tide." Following the completion of the dredging in 2009, the defendants' business operations on the property commenced.

The invoices for the repairs and improvements for the period 2000 to 2019 totaled $893,900.[11] In determining the amount, if any, that the plaintiff should contribute toward the cost of the improvements made, the court balanced the equities and reasonably acknowledged that, "[w]hile it would be inequitable to permit the [defendants] to set off costs that were incurred solely for . . . Bloom's benefit against the just compensation due to [the plaintiff], it would also be inequitable to allow [the plaintiff] to contribute nothing *when much of the [defendants'] investment was necessary for the property to be useable at all.*"[12] (Emphasis added.) Although the court did not make an explicit finding as to the precise effect that the improvements had on the market value of this unique waterfront property, the court arrived at an amount that took into account these equitable considerations by excluding from its calculation any expenditures made by the defendants after

2009 (the time when the defendants began business operations on the premises), or the amount of any profits reflected in the defendants' invoices. As such, the court found that between 2000 and 2009, the defendants invested $728,609[13] in costs and labor to restore and improve the property and that they were entitled to a credit of one third of this amount—or $242,870—to be subtracted from the plaintiff's undivided one-third interest in the property ($441,667). It reasonably found that these expenses "benefited all of the co-owners of the . . . property."

On the record before us, we cannot conclude that the court abused its equitable discretion in awarding just compensation in this instance.

II

The plaintiff next argues that the trial court abused its discretion in calculating just compensation by failing to include any compensation for the defendant's twenty year exclusive use and occupancy of the property. We disagree.

Section 52-404 (b) provides: "When two or more persons hold property as joint tenants, tenants in common or coparceners, if one of them occupies, receives, uses or takes benefit of the property in greater proportion than the amount of his interest in the property, any other party and his executors or administrators may bring an action for an accounting or for use and occupation against such person and recover such sum or value as is in excess of his proportion." See also *Lerman* v. *Levine*, 14 Conn. App. 402, 408–409, 541 A.2d 523 (ouster not prerequisite for entitlement to accounting for use and occupancy), cert. denied, 208 Conn. 813, 546 A.2d 281 (1988).

Although § 52-404 (b) does not require a cotenant who does not occupy the property to establish ouster in order to be entitled to collect for use and occupancy, the nonoccupying cotenant must establish more than that he is a cotenant out of occupancy. At a minimum, the party claiming entitlement to equitable relief for use and occupancy must prove the reasonable value owed to him by his cotenant. See *Coughlin* v. *Anderson*, 270 Conn. 487, 512, 853 A.2d 460 (2004) ("[i]t is axiomatic that the burden of proving damages is on the party claiming them" (internal quotation marks omitted)).

At trial, the plaintiff presented the testimony of Michael D. McGuire, a real estate valuation expert, and a written valuation analysis he prepared regarding the fair market rental value of the property from January 1, 2000, to the present. McGuire calculated the fair market rental value of the property as if the defendants were occupying the property under a long-term ground lease. McGuire concluded in the fair market rent valuation analysis that the fair market rental value of the property was $90,094 annually for the years 2000 through 2019.

The court, however, found McGuire's valuation not credible. It stated that "[the plaintiff] has failed to offer credible evidence to establish the fair market rental value of the . . . property." The court agreed with the defendants that the fair market rent valuation analysis provided by McGuire was "based on arbitrary assumptions and so significantly flawed that it cannot be considered credible evidence of the fair market value rent of the . . . property."

Although the plaintiff argues that his expert provided a reasonable basis for determining fair market rent and that the court erred in accepting the defendants' criticisms of his expert's assumptions, it is well settled that "[t]he weight to be given the evidence and the credibility of the witnesses are within the sole province of the trial court." (Internal quotation marks omitted.) *Antonucci* v. *Antonucci*, 164 Conn. App. 95, 130, 138 A.3d 297 (2016). "The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 26, 807 A.2d 955 (2002). "[T]he trial judge . . . is free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *LaBossiere* v. *Jones*, 117 Conn. App. 211, 224, 979 A.2d 522 (2009). "Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Gianetti* v. *Norwalk Hospital*, 304 Conn. 754, 766, 43 A.3d 567 (2012). "Where the trial court rejects the testimony of a plaintiff's expert, there must be some basis in the record to support the conclusion that the evidence of the [expert witness] is unworthy of belief." (Internal quotation marks omitted.) *Builders Service Corp.* v. *Planning & Zoning Commission*, 208 Conn. 267, 294, 545 A.2d 530 (1988).

The court's decision not to credit McGuire's valuation was fully supported by the evidence. In particular, the court found McGuire's valuation severely flawed because, among other things, McGuire used a figure of $1,400,000 for the fair market value of the property, notwithstanding the October, 2017 appraisal; McGuire determined the fair market rental value of the property as if the plaintiff and the defendants were the landlord and tenant, respectively, under a long-term ground lease, rather than analyzing comparable rentals; McGuire had no basis for assuming that the hypothetical ground lease contained a "not less than" clause; and the fair

market rent valuation analysis failed to consider the actual condition of the property, although it assumed a marine commercial use of the property.[14] These shortcomings, which are reflected in the record, clearly bear on the reliability of the valuation, and provide an adequate basis for the court's finding that McGuire's valuation was not credible.[15] See *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 244, 963 A.2d 943 (2009) ("[w]here the factual basis of an opinion is challenged the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated are such as to make an opinion based on them without substantial value" (internal quotation marks omitted)). Accordingly, we cannot conclude that the court erred in not awarding the plaintiff compensation for the defendants' use and occupancy of the property.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Joseph Richichi and Leslie Miklovich, in their capacity as cotrustees of the Hillard E. Bloom Revocable Trust, were codefendants and cross claim defendants in the underlying action. During the pendency of the action, Richichi passed away, and Patrick D. McCabe succeeded Richichi as cotrustee of the Hillard E. Bloom Revocable Trust. The trial court concluded that McCabe and Miklovich, as cotrustees of the Hillard E. Bloom Revocable Trust (Hillard Bloom Trust cotrustees), also had a minimal interest in the subject property and ordered them to quitclaim their undivided one-sixth interest in the property to the defendants for just compensation. Before the hearing was held to determine the amount of just compensation to be paid to the plaintiff and the Hillard Bloom Trust cotrustees, the Hillard Bloom Trust cotrustees entered into a stipulation with the defendants to resolve their claims for just compensation. The Hillard Bloom Trust cotrustees did not participate in this appeal.

[2] Hereinafter we refer to McCabe and Miklovich, as cotrustees of the Hillard Bloom Trust, as the "Hillard Bloom Trust cotrustees."

[3] General Statutes § 52-500 (a) provides: "Any court of equitable jurisdiction may, upon the complaint of any person interested, order the sale of any property, real or personal, owned by two or more persons, when, in the opinion of the court, a sale will better promote the interests of the owners. If the court determines that one or more of the persons owning such real or personal property have only a minimal interest in such property and a sale would not promote the interests of the owners, the court may order such equitable distribution of such property, with payment of just compensation to the owners of such minimal interest, as will better promote the interests of the owners."

[4] The court previously credited the methodology used by Ronald McInerney, an expert appraiser who testified on behalf of the defendants, as to the fair market value of the property. The court noted, however, that almost two years had passed since McInerney completed his appraisal and that the court was not inclined to determine the amount of just compensation to be paid to the plaintiff on "a stale appraisal."

[5] The court noted that it calculated this amount "by subtracting $84,334 (the total of the post-2009 expenses reflected on the [defendants'] exhibit I) from $893,900, and then reducing that amount ($809,566) by 10 percent to eliminate the profit that Mr. Bloom testified was included in the invoiced amounts." The court subtracted the $84,334 from the amount because Bloom's business operations on the property commenced in 2009.

[6] We note that the plaintiff does not challenge on appeal the trial court's findings that his interest in the property was minimal and that a sale would not promote the interests of the owners.

[7] The plaintiff similarly cites to *Levay* v. *Levay*, 17 Conn. Supp. 470, 473 (1952), which relies on *Neumann*, for his contention that he is not required to contribute toward the improvements made to the property. The plaintiff's reliance on *Levay*, however, is misplaced for the same reason his reliance on *Neumann* is misplaced. Furthermore, we note that this court is not bound by decisions of the Superior Court. See *In re Carla C.*, 167 Conn.

App. 248, 275, 143 A.3d 677 (2016) ("our appellate courts are not bound to follow the decisions of the trial court").

[8] The plaintiff in *Hackett* claimed entitlement to a greater amount, arguing that he had "paid the mortgage since September, 1978, without any contribution from the defendant [and that] this is twelve (12) years at an average of approximately $475 per month for a total of $68,400." (Internal quotation marks omitted.) *Hackett* v. *Hackett*, supra, 42 Conn. Supp. 52. The court, however, rejected this contention, stating that the plaintiff "does not point out how he gets this figure of approximately $475 per month on the evidence adduced in the present case. There is not in evidence in the present case any cancelled check, any receipt, any book of record, any proof of any payment claimed to have been made by the plaintiff." Id. The court "recognized that there may be cases where proof of such claims, as with damages, are difficult, but it is relevant here to remember that '[t]he court must have evidence by which it can calculate damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount.' " Id., 53. The court concluded that "[t]he only hard evidence before the court of any figure of the mortgage that fairly extends over the entire period from September, 1978, to the time of trial is the monthly payment of $275 on principal and interest. Starting with September, 1978, and through September, 1990, these monthly payments amount to a gross figure of about $39,875." Id., 53–54.

[9] The court observed that at the trial, the defendant indicated that she was not making a formal claim for entitlement to payment for use and occupancy. See *Hackett* v. *Hackett*, supra, 42 Conn. Supp. 50.

[10] The record discloses that the property historically had been used for marine related business purposes. For example, the trial court found that Wallace Bell, from whom Norman and Hillard Bloom acquired the property in 1962, operated a boatyard on the property under the name "Bell's Boatyard" until the late 1970s. After that time, the property was rented to "to Maurice Marine, a company that hauled and maintained small pleasure boats."

[11] The court found that "[t]he invoices include a profit margin of around 10 percent."

[12] As previously noted, the court credited the methodology that McInerney used in reaching the market value of the property in this case. The record discloses that McInerney testified that the sales comparison approach that he used was the most pertinent method and explained, inter alia, that "for a property like this, the main feature is that we take into consideration and account for the differences between the subject and the comparables, [which] would be location, size of the property, *any of the site improvements that are present* in the subject and comparables, *water access*, *how available the water access is*, utility of the lot, views." (Emphasis added.) When asked specifically, McInerney testified that his market value included the land and improvements on the property. It was thus reasonable for the court to infer from the evidence in the record that the restoration and improvements to the property increased its value.

[13] See footnote 5 of this opinion.

[14] The court explained that "McGuire testified that he was not aware of this court's findings in the September, 2017 memorandum of decision that it was not possible to operate any marine related business from the property in 2000, or that commercial boats could not use the property until the seabed portion was dredged in 2009."

[15] Citing to *Welsch* v. *Groat*, 95 Conn. App. 658, 666–67, 897 A.2d 710 (2006), the plaintiff also argues that the trial court failed to draw upon its own judgment and experience in determining the reasonable fair rental value. He argues that it "is difficult to understand how the trial court possibly could conclude that a monthly rental of $7500—or at least an amount within that range—would not constitute a fair market rental for the property." This claim is without merit and deserves little discussion. Contrary to the plaintiff's contention, *Welsch* stands for the unremarkable proposition that a court may rely on its common sense in drawing reasonable inferences from the credible evidence before it. It does not, however, suggest that a court may derive a proper value of use and occupancy based on its own experience when there is no credible evidence in the record establishing such value. A court "must have evidence by which it can calculate . . . damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount." *Bronson & Townsend Co.* v. *Battistoni*, 167 Conn. 321, 326–27, 355 A.2d 299 (1974). In the court's determination, the plaintiff presented no such credible evidence.